[Cite as *State v. Montgomery*, 2023-Ohio-4472.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

TIMOTHY MONTGOMERY,

    DEFENDANT-APPELLANT.

CASE NO. 3-23-05

O P I N I O N

Appeal from Crawford County Common Pleas Court
Trial Court No. 21-CR-0380

Judgment Affirmed

Date of Decision:  December 11, 2023

APPEARANCES:

    *Christopher Bazeley* for Appellant

    *Daniel J. Stanley* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Timothy Montgomery ("Montgomery") brings this appeal from the judgment of the Common Pleas Court of Crawford County finding him guilty of two counts of murder. On appeal, Montgomery claims that 1) the trial court's verdict was against the manifest weight of the evidence and 2) the trial court erred by ruling incorrectly on questions regarding the admission of evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} This matter arises from an incident that occurred after a bar dispute involving Montgomery, Jacqueline Montgomery ("Jacqueline"), Cameron Davis ("Davis"), and Michael Benedict ("Benedict"). The dispute was resolved by the arrival of the police and the parties left the scene. Later, the police received a call about a disturbance and a man lying in the road. The police discovered Benedict lying in the road while Montgomery, Jacqueline, and Davis were walking away. Benedict subsequently died from his injuries. After investigating, all three were arrested.

{¶3} On November 12, 2021, the Crawford County Grand Jury indicted each of them on four counts: 1) aggravated murder in violation of R.C. 2903.01(A) and 2929.02(A), an unclassified felony; 2) murder in violation of R.C. 2903.02(A), 2903.02(D), and 2929.02(B), an unclassified felony; 3) felony murder in violation of R.C. 2903.02(B), 2903.02(D), and 2929.02(B), an unclassified felony; and 4)

felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(D)(1)(a), a felony of the second degree. Montgomery entered pleas of not guilty to all counts. The State filed a motion to sever Davis' trial from that of Montgomery and Jacqueline. The trial court granted the motion and then the parties agreed that all three cases would be severed.

{¶4} The trial court held a jury trial for Montgomery from February 6 to February 9, 2023. At the conclusion of the trial, the jury returned verdicts of not guilty as to the aggravated murder charge (Count One). The jury found Montgomery guilty of murder (Count Two) and felony murder (Count Three). The State previously made an oral motion to dismiss the felonious assault charge (Count Four), which was granted by the trial court during the trial. At the sentencing hearing, the trial court determined that Counts Two and Three merged for the purpose of sentencing, and the State elected to proceed to sentence on Count Three. The trial court then sentenced Montgomery to an indefinite prison term of 15 years to life with jail time credit of 488 days. Montgomery appealed from this judgment and on appeal raises the following assignments of error.

**First Assignment of Error**

**Montgomery's conviction is against the weight of the evidence.**

**Second Assignment of Error**

**The trial court abused its discretion when it prevented cross-examination on the extent of Davis' plea agreement but allowed**

**testimony regarding a crime committed against Montgomery by an unrelated person with the same last name as the victim.**

*Manifest Weight of the Evidence*

**{¶5}** Montgomery claims in his first assignment of error that the conviction

is against the manifest weight of the evidence.

> **When reviewing a judgment to determine if it is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Mendoza*, 137 Ohio App.3d 336, 738 N.E.2d 822 (2000). See, also, *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Thompkins* at 387, 678 N.E.2d 541. Although the appellate court acts as a "thirteenth juror," due deference to the findings made by the fact-finder must still be given. *State v. Moorer*, 3d Dist. 13–12–22, 2013-Ohio-650, 2013 WL 684735, ¶ 29.**

*State v. Hulbert,* 3d Dist. Van Wert No. 15-19-07, 2021-Ohio-2298, ¶ 23.

**{¶6}** Montgomery was convicted and sentenced on one count of felony

murder in violation of R.C. R.C. 2903.02(B), which provides as follows.

> (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

R.C. 2903.02(B).   The State alleged that the predicate offense in this case was

felonious assault and alleged in the indictment, that at the least, Montgomery aided

and abetted Davis or Jacqueline in the commission of the felonious assault that resulted in Benedict's death. At trial, the following testimony was presented.

{¶7} Alexander Eddy ("Eddy") testified that on October 10, 2021, he was at Just Jokin', a bar where Montgomery, Jacqueline, Davis, and Benedict were also present. Eddy testified that he heard Davis bragging about being the "best, baddest dude". Tr. 127. Jacqueline was also getting loud. Benedict was present and he was "the drunkest". Tr. 128. All of them were getting rowdy because the bartender had cut them off. Eventually, the bartender asked them all to leave because she did not want any fighting in the bar. Once everyone left, Eddy went outside and tried to get three of the people, who were friends of Benedict, to leave in their car. The friends and Eddy were trying to keep Montgomery and his co-defendants separate from Benedict and to get Benedict into the car without success. Jacqueline and the friends were yelling back and forth, with the men calling her names, which upset Montgomery. Eddy went back in the bar to wait for the police to arrive.

{¶8} On cross-examination, Eddy testified that he only remembered the names of the people involved after they were pointed out to him. According to Eddy, Montgomery was "pretty quiet and reserved" that night. Eddy testified that Benedict was drunk and "riled up" at Jacqueline. When Eddy returned to the bar, no one had left the parking lot yet.

{¶9} Interim Chief of Crestline Police Department Jason Kitzmiller ("Kitzmiller") testified that on the night in question he was a detective, but answered

the call regarding the disturbance because other officers were out with COVID. Kitzmiller testified that Davis tends to get "heated" when things do not go his way. Kitzmiller spoke with all three co-defendants in this case while Officer Jeff Travaglianti ("Travaglianti") spoke with Benedict and his friends. Montgomery told him that Benedict had hit Jacqueline. Kitzmiller and Travaglianti then discussed whether to bring charges against Benedict. Eventually, Kitzmiller told Montgomery, Jacqueline, and Davis to just leave and the they walked away from the bar. While they were walking away, Kitzmiller was trying to determine where Benedict had gone. Kitzmiller and Travaglianti each got in their respective vehicles and drove away from the bar looking for Benedict.

{¶10} While looking for Benedict, Kitzmiller received another 911 call. A report was received of a male lying in the road and two other males and a female walking away. Kitzmiller went to the scene and found Montgomery, Jacqueline, and Davis. While speaking to them, he heard that the man in the street was unconscious. Davis then got down on his knees and put his hand behind his head. However Kitzmiller was paying more attention to Montgomery because of the blood on Montgomery's shirt. Kitzmiller was going to arrest Montgomery due to the blood, but Davis came over and told Kitzmiller what he did. Davis told Kitzmiller that "if anybody deserves to go to jail, it's [Davis]." Tr. 176. Not knowing exactly what happened, Kitzmiller arrested Davis and allowed Montgomery and Jacqueline to return to their home.

{¶11} Kitzmiller went to the scene to assist and found Benedict lying in the middle of the road. Kitzmiller then drove the ambulance to allow both of the EMTs to work on Benedict, who was critically injured. Eventually, Kitzmiller learned about the involvement of Montgomery and Jacqueline and arrested them. Kitzmiller also obtained a search warrant for Montgomery's shirt.

{¶12} A couple weeks after the incident, Benedict's girlfriend brought Benedict's cell phone to the police. The records indicate that Benedict called Montgomery two times before the incident and sent a text message as well. The text message was sent at 1:38 am from Benedict to Montgomery and said "Come on baby, are you okay to send it to me and let me know you are okay. Okay baby, get a hold of me when you want to hang out." Tr. 187-188. Kitzmiller also identified Ex. 4 as Davis' shirt with blood on it and Ex. E-3 as Montgomery's blood gray t-shirt. Ex. E-4 were Montgomery's sweatpants with blood on the front of them. Ex. F-2 was identified as the report on the DNA comparison results and the parties stipulated to its accuracy that the blood belonged to Benedict.

{¶13} On cross-examination, Kitzmiller admitted that both Montgomery and Davis were agitated, but eventually agreed just to walk home. Kitzmiller testified that although they tested Davis' shoes for blood, no tests were run on Montgomery's shoes because they did not have blood on them. Benedict had been told to remain at the bar, but left which was why Kitzmiller and Travaglianti were looking for him. Benedict was not from Crestline, where the bar was, but left on foot. When

Kitzmiller stopped Montgomery, Jacqueline, and Davis to speak with them after the call about a man in the road, they did not attempt to avoid him or run away. Montgomery repeatedly denied touching Benedict. When Kitzmiller put the handcuffs on Montgomery, Davis came forward and said that he was the one who assaulted Benedict. Davis also said at that time that Montgomery had not done anything. When Kitzmiller asked Montgomery how he got blood on him, Montgomery stated "I pulled him off." Tr. 209. Davis then repeated that he had done it, that Montgomery had not done anything and even swore on his children's lives that he did it. Davis then stated that Montgomery was "being a good Samaritan". Tr. 210. Jacqueline then questioned why Davis was being arrested. Davis responded that he was "going to jail because [he] put hands on the dude, and [he] beat his [expletive] ass because he deserved it". Tr. 211. Kitzmiller also stated that he did not know what the text message from Benedict to Montgomery was about. Both Davis and Montgomery showed their hands to Kitzmiller when interviewed. Davis' hands were cut with bruises and swelling, but Montgomery's had no marks on them. The caller to 911 indicated that the people assaulting Benedict were using their hands.

{¶14} Deputy Brian Wozniak ("Wozniak") testified that he was employed by the Crawford County Sheriff's Office on the night of the incident and that he responded to the second 911 call. Wozniak was present when Montgomery and Jacqueline were arrested. When Wozniak walked up, Travaglianti was placing

Montgomery under arrest. Montgomery stated that he never touched Benedict, but did not explain the black eye he had.

**{¶15}** Davis was the next witness for the state. Davis testified that he was a neighbor of Montgomery and Jacqueline. On the night of the incident, they all decided to go to the bar. They walked to the bar and stayed for two hours. Davis drank five or six beers and was "pretty drunk". Before that night, Davis did not know Benedict. Davis told a joke that offended someone. Although Davis repeatedly apologized, Benedict got angry. Davis paid his tab and went to leave when he was sucker punched by Benedict. Davis then began yelling at Benedict while Montgomery and Jacqueline were arguing with Benedict and his friend. Davis spoke with the police and told them about racial slurs that were made along with Jacqueline's claim that she had been hit. Davis testified that he believed Jacqueline had been hit that evening by Benedict, even though he had not seen it happen. Montgomery was angry that night because of this.

**{¶16}** After they left the bar, Davis, Montgomery, and Jacqueline were walking home when Montgomery saw Benedict walking along the street. Montgomery pointed Benedict out to Davis and said "that is the guy at the bar that sucker punched you and hit [Jacqueline]." Davis then went to confront Benedict verbally. Davis testified that he did not intend to fight Benedict, but Benedict was "aggressive" and acted like he was going to hit Davis again. Davis then swung and hit Benedict. Davis was holding his vape pen in his hand when he hit Davis.

Benedict then took a defensive stance and Davis swung again causing Benedict to fall onto his bottom. Davis admitted to hitting Benedict five times with his right hand and broke his hand on the last punch. Davis also admitted to kicking him two times. Davis then walked away.

{¶17} After Davis walked away, Jacqueline and Montgomery went up to Benedict and Montgomery struck Benedict with his elbow at least 12 times. Davis testified that he saw Montgomery strike Benedict with his right elbow. According to Davis, Jacqueline then yelled "that is enough" before she walked up and kicked Benedict and struck him in the face with her hand. Davis did not see Benedict get up on his feet after that and did not hear anyone yelling at them. The three of them then walked away to go home.

{¶18} While walking, Kitzmiller pulled up and stopped them. Davis admitted to telling Kitzmiller that he was the one responsible for hitting Benedict, but claimed the statement was not the truth. Davis stated that he thought he was confessing to a simple assault and since he was involved in the fist fight, he felt guilty with them arresting Montgomery. Davis did not want Montgomery to go to jail that night.

{¶19} Davis admitted that he was arrested and indicted on the same charges as Montgomery. Davis also admitted that he had entered into a plea agreement where he agreed to testify against Montgomery and Jacqueline and in exchange he

would be sentenced to a prison term of 20 years with eligibility for judicial release after 10 years.

{¶20} On cross-examination, Davis admitted that he, Montgomery, and Jacqueline were all "pretty drunk". After being punched by Benedict, Davis was angry and called Benedict names. Benedict "was mouthing off back as well." Tr. 272. Davis also admitted that he had previously been involved in an altercation at that same bar. When Davis struck Benedict on the street, Benedict did not strike back at Davis. Davis admitted that the first time he kicked Benedict, he kicked him in the face. Benedict was already bleeding before he was kicked. Davis admitted that he agreed to plead guilty to a lesser offense in exchange for his testimony.

{¶21} Kris Kegley ("Kegley") testified that he heard voices arguing outside his home, so he stuck his head out of his window to see what was happening. Kegley saw two men getting ready to fight. When one of the men fell down, the other started punching and kicking him. Then the three people walked away and he called 911. While on the phone, the three came back. Kegley told the 911 operator that the first time that the two men were "stomping, kicking, and punching the victim" and that they came back. When they returned, "they came back UFC, bam, bam, bam, bam, bam, and while down and two men kicking and stomping him into the pavement." Tr. 307. Later a female became involved. One of the men was thinner and the other was "chunkier". The first man who fought the victim was the smaller of the two. Kegley did not recall who was doing the "UFC mounts". Kegley

testified that he knew Montgomery but did not know if he was one of the men he saw. However, if one of them was Montgomery, it would have been the smaller of the two. Kegley testified that he yelled at them twice to stop. Kegley did not see anyone attempt to help Benedict.

{¶22} Travaglianti testified that he spoke with Benedict on the night in question after responding to a call about an incident at the bar. Travaglianti had told Benedict to wait by a pole while he spoke with others, but when he went back to the pole, Benedict was gone. Travaglianti then left the bar to look for Benedict. While searching for Benedict, Travaglianti received a dispatch about a fight and he went to the scene. He found Benedict lying on the ground injured. EMS was called and Travaglianti waited with Benedict. Later Travaglianti went to Montgomery's house to arrest Montgomery and Jacqueline. When Montgomery was arrested, he had a bruise near his eye which appeared to have been the result of being punched by someone. On cross-examination Travaglianti admitted that Montgomery would have injuries to his hands if he had struck Benedict with his fists. When Travaglianti looked at Montgomery's hands, there were no injuries or blood on them. Following Travaglianti's testimony, the State rested its case.

{¶23} Montgomery then testified that on the night of the incident, the three defendants had all gone to a local bar. While he was playing pool, Jacqueline came over to him and stated that Davis was "starting" something. Montgomery testified that Davis was drunk and was yelling that Davis was "the baddest [expletive] in the

bar." Tr. 360. Montgomery then told Davis to quit because he was annoying other people, including Benedict. Montgomery denied knowing who Benedict was and indicated that he had never seen him before. Montgomery stated that he spoke to Benedict that evening afterwards and they were talking about tattoos. After Montgomery indicated that he wanted to get another tattoo, Benedict then entered Montgomery's phone number into Benedict's phone and called Montgomery's phone so that Montgomery would have Benedict's number. Montgomery then went to play pool again. Later Davis began starting trouble again, so Montgomery went to try and calm the situation. Benedict and his friends went outside and Montgomery went out to speak with them. Then Davis came out and started arguing with Benedict. Benedict's friends tried to get him into the car, but he refused to leave. Montgomery testified that he did not see anyone punch Jacqueline. When he found out that Benedict had hit Jacqueline, Montgomery wanted to hit Benedict, but he did not do so and then the police arrived.

{¶24} While walking back to his house with Jacqueline and Davis, Davis spotted someone walking on a street, said it was Benedict, and started running toward the man. Montgomery testified that he and Jacqueline stood on the corner watching Davis go up to Benedict and hit Benedict. Montgomery testified that Davis threw Benedict into the road and began kicking him in the mouth. Montgomery told Davis to stop, but Davis did not do so. Montgomery testified that he saw Davis kick Benedict a couple of times and then stomp on Benedict.

Montgomery then turned and started walking away with Jacqueline. Montgomery stated that he felt bad and decided to check on Benedict. When he turned around to go back, Davis then jumped on Benedict again. Montgomery testified that when he checked on Benedict, he was spitting blood, so he picked him up to move him into the light. Davis was angry at the time, but Montgomery convinced him to leave.

{¶25} While they were walking, Kitzmiller pulled up and was going to arrest Montgomery. Montgomery denied attacking Benedict and Davis showed his hands to Kitzmiller after admitting that he was the one who had struck Benedict. Davis' hands were "busted up" from punching Benedict. Montgomery stated that he had pulled Davis off Benedict. Then Kitzmiller released him and arrested Davis. Montgomery admitted that he removed his shirt because it had blood on it, but denied that he had assaulted Benedict. He then went to Davis' home to tell his wife that Davis had been arrested. When he was returning to his home, the police arrived and arrested him.

{¶26} On cross-examination Montgomery testified that he picked up Benedict and moved him into the light so he could see his face to identify him. Montgomery claimed that he did not believe the victim was really Benedict until Kitzmiller told him it was. He believed Davis had mistakenly beat up a random person. Montgomery also denied having a problem with Benedict. The State asked him if a different man with the last name of Benedict had broken into his home in

the past and Montgomery agreed this had happened. Montgomery did not know if there was any relation between the two men.

{¶27} The jury in this case found that Montgomery 1) purposely caused the death of Benedict or aided and abetted one of his co-defendants in doing so and 2) caused the death of Benedict while committing felonious assault or aided and abetted one of his co-defendants in doing so. The evidence is clear that Davis, Jacqueline, and Montgomery were all involved in the assault of Benedict. Kegley testified that he observed all three of the assailants striking Benedict. Though Kegley was not able to identify who the assailants were, he did testify to the actions of the people, including that the two males were repeatedly kicking and stomping the victim. The evidence shows that Montgomery, Davis, and Jacqueline were the ones involved. Benedict's blood was found on Montgomery's clothing. Montgomery admits that he was present and did not do anything to stop Davis from assaulting Benedict, did not seek assistance for Benedict despite knowing he was seriously injured, and was attempting to walk away from the scene when stopped. A reasonable juror could conclude that Montgomery participated in the attack on Benedict. At the very least, the evidence shows that Montgomery aided and abetted Davis, who Montgomery claims was the one to repeatedly strike and "stomp" Benedict. Given all of the evidence before it, we do not find that the jury lost its way creating a miscarriage of justice. Thus, the verdicts are not against the manifest weight of the evidence. The first assignment of error is overruled.

{¶28} Montgomery claims in the second assignment of error that the trial court erred by 1) limiting discussion regarding the plea agreement received by Davis and 2) by allowing the State to question Montgomery about a crime against Montgomery several years prior in which the perpetrator had the same last name as Benedict. The first argument is that the trial court should not have limited the discussion about the potential sentence Davis could have received without the plea agreement. In this case, Davis reached a plea agreement in which he would enter guilty pleas and would serve a sentence of 20 years in prison with the possibility of early release after 10 years. The trial court did not allow the defense to mention that by reaching the agreement, Davis potentially avoided a sentence of 15 years to life in prison. Instead, the trial court limited the defense to saying that by accepting the plea offer, he "avoided some significant and substantial prison time".

{¶29} Montgomery argues that he should have been able to cross-examine Davis regarding how avoiding a possible life sentence was a motive to lie on the stand. "The scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest in the sound discretion of the trial judge." *State v. Lundgren*, 73 Ohio St.3d 474, 487, 1995-Ohio-227, 653 N.E.2d 304. Thus the decision of the trial court on these matters will not be reversed absent a showing that the trial court's attitude was arbitrary, unreasonable, or unconscionable. *State v. Patton*, 6th Dist. Lucas No. L-12-1356, 2015-Ohio-1866. As long as the defense has the opportunity to question testifying co-defendants regarding the full benefits

of their plea agreements and demonstrate the bias or prejudice of the co-defendants, the trial court does not err by limiting cross-examination on speculative issues. *Lundgren, supra.*

{¶30} A review of the record shows that Montgomery was able to question Davis about the plea agreement. Counsel for Montgomery specifically asked Davis what offenses he would be admitting via a guilty plea and the sentence he would receive. Davis admitted that he took the offered deal because the prosecutor would recommend a sentence of 20 years in prison, but with early release, he "would come home in ten years." Tr. 292. Notably, the defense did not ask Davis if he had "avoided some significant and substantial prison time" when questioning him, despite being permitted to do so. The exact amount of time that he was avoiding was speculative since no one knew what verdicts a jury would return if Davis had taken the case to trial. Since the defense had the opportunity to question Davis about the plea agreement and was able to demonstrate the benefits Davis received, the trial court did not err by limiting discussion about what potential sentence Davis may have received if he was convicted of the original charges. *Lundgren, supra.*

{¶31} Next Montgomery argues that the trial court erred by allowing the State to question him about an unrelated incident to show motive. The record shows the following dialogue occurred between the State and Montgomery.

Q. At the bar, you met Mikey you called him Mikey, when did you know him as Mikey?

-17-

A. When my wife got me and he started his shit up there, I knew it was Mikey.

Q. Did you get his last name?

A. Not at that time.

Q. You got it at closing time?

A. Excuse me? I did not catch his at the present time I talked to him for a while.

Q. You learned his last name?

A. Yes.

Q. What is the last name?

A. Benedict.

Q. You have a problem with Benedict?

A. No.

Q. Didn't a Benedict brake [sic] into your house here?

Mr. Hitchman: Objection.

* * *

Q. At some point in your life in the past prior to this, did a Benedict break into your house, and steal stuff from you?

A. Yes, he did.

Q. How long past as of October?

A. I am not for sure how many years.

Q. What did he steal?

A. Guns and ammo.

Q. You knew it was a Benedict that was caught?

A. Dominic Benedict.

Q. Is he related to Mikey?

A. I'm not sure.

Tr. 383-385. The trial court overruled the objection showing it was a motive for a crime.

{¶32} On appeal, Montgomery argues that the evidence of the prior incident with a person with the same last name as the victim in this case was irrelevant and should not have been permitted. We agree. A review of the record does not show when this unrelated offense occurred. The only evidence we have regarding it is that it was years ago and that the perpetrator was caught. There is no evidence that Montgomery knew or even suspected that Dominic Benedict, the offender in the prior case, was related to Michael Benedict, the victim in this case. That is nothing but speculation on the part of the State. A review of the body cam footage shows that Montgomery was unhappy with Benedict for hitting Jacqueline, but no mention is made of anything related to the prior theft case. The Supreme Court of Ohio has held that speculation about a defendant's thought processes to form a motive that is not supported by the evidence in the case is not relevant. *State v. Tench,* 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 154, 123 N.E.3d 955. Mere speculation based upon

two people having the same last name is not evidence regarding what Montgomery was thinking which would justify bringing in irrelevant evidence.

**{¶33}** Although the State should not have been permitted to ask irrelevant questions, the error is not prejudicial as it was harmless. "[A] judgment of conviction should not be reversed because of 'the admission * * * of any evidence offered against * * * the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby.'" *State v. Crawford*, 32 Ohio St.2d 254, 255, 291 N.E.2d 450 (1972). The evidence here was harmless because it was not material to the convictions in this case. *State v. Snowden,* 2d Dist. Montgomery No. 28096, 2019-Ohio-3006, 140 N.E.3d 1112 (holding that improperly admitting irrelevant evidence which did not materially contribute to conviction is a harmless error). The State already had another motive that Montgomery admitted during his testimony and heard on the body cam footage. Montgomery stated that he was angry with Benedict for hitting Jacqueline. This was a much more recent event and more likely to be a motive for what happened than an unrelated incident involving a different person with the same last name that occurred years prior. Additionally, the jury acquitted Montgomery of the aggravated murder charge, which would have required a finding of prior calculation. Viewing the evidence as a whole, it does not appear that the verdict would have been different if the jury did not know about Montgomery previously being the

victim of a robbery by someone with the same last name as the victim in this case. The second assignment of error is overruled.

{¶34} Having found no error prejudicial to the Appellant in the particulars assigned and argued, the judgment of the Common Pleas of Crawford County is affirmed.

***Judgment Affirmed***

**MILLER, P.J. and ZIMMERMAN, J., concur.**

**/hls**