[Cite as *State v. Montgomery*, 2024-Ohio-2520.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 3-23-16

    v.

JACQUELINE MONTGOMERY,          O P I N I O N

    DEFENDANT-APPELLANT.

---

**Appeal from Crawford County Common Pleas Court**
**Trial Court No. 21-CR-0380**

**Judgment Affirmed**

**Date of Decision: July 1, 2024**

---

APPEARANCES:

    *William T. Cramer* **for Appellant**

    *Daniel J. Stanley* **for Appellee**

**MILLER, J.**

**{¶1}** Defendant-Appellant, Jacqueline Montgomery ("Jackie"), appeals the April 12, 2023 judgment issued by the Crawford County Court of Common Pleas following a jury verdict and conviction for felony-murder. Jackie argues her right of confrontation at trial was violated and her conviction was against the weight of the evidence. For the reasons that follow, we affirm.

## I.     FACTS AND PROCEDURAL HISTORY

**{¶2}** On November 12, 2021, Jackie was indicted, along with her husband Timothy W. Montgomery ("Tim") and their neighbor Cameron Everett Davis ("Davis"), in connection with the beating and death of Michael Benedict ("Benedict"). Jackie was charged with four counts: (1) aggravated murder, in violation of R.C. 2903.01(A); (2) murder, in violation of R.C. 2903.02(A); (3) murder, in violation of R.C. 2903.02(B); and (4) felonious assault, in violation of R.C. 2903.11(A)(1). Regarding the third count, for what is commonly known as felony-murder, the Indictment alleged that Jackie:

> did cause the death of, [sic] as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, to wit: Felonious Assault, and that is not a violation of section 2903.03 or 2903.04 of the Revised Code or did, aid and abet Timothy W. Montgomery and Cameron E. Davis in committing the offense of MURDER, in violation of Section 2903.02(B) of the Revised Code MURDER, an unclassified felony punishable by life in prison and a fine of up to $15,000.00 in violation of § 2903.02(B), 2903.02(D), 2929.02(B) of the Revised Code,

-2-

> MURDER, an unclassified felony, punishable by life in prison and a fine of up to $15,000.
>
> In violation of Ohio Revised Code, Section § 2903.02(B), 2903.02(D), 2929.02(B) and against the peace and dignity of the State of Ohio.

(Indictment). Thus, this count included charging Jackie with aiding and abetting Tim and Davis in committing felony-murder. Tim and Davis were each charged with four counts that were very similar to the four counts against Jackie.

{¶3} On October 12, 2022, the cases were severed, with each of the three defendants given a different case number and trial date. Tim went to trial first, and he was found guilty of two counts of murder.[1] Jackie's case went to trial starting on March 6, 2023. Prior to her trial, the State dismissed the felonious assault count against Jackie.

{¶4} The first witness at Jackie's trial was Maryssa Claytor ("Claytor"), who was a bartender at Just Jokin' in Crawford County on the night of the incident. Among the patrons at the bar that night were Jackie, Tim, and Davis, as well as the victim, Benedict. Claytor kicked all of them out of the bar because they were arguing and she did not want things to escalate. A video taken from one of the bar's security cameras was played during Claytor's testimony. She testified the video showed Jackie stepping between Davis and Benedict, after Benedict had pushed Davis.

---

[1] This conviction was affirmed in *State v. Montgomery*, 3d Dist. Crawford No. 3-23-05, 2023-Ohio-4472.

{¶5} Next, the State called detective Jason Kitzmiller ("Detective Kitzmiller") from the Crestline Police Department. Detective Kitzmiller testified he was dispatched to Just Jokin' at around 2:00 a.m. on October 10, 2021. Detective Kitzmiller's body camera video was played for the jury. On the video, Jackie complained about her left wrist and that she had been hit; with her husband Tim standing by her, she said Tim "should have [fought Benedict] when he punched me"; and Jackie indicated she just wanted to go home. (State's Exhibit B-1). With Jackie standing next to Tim, Tim told Detective Kitzmiller: "If nothing's going to happen to [Benedict], I'm going to take it into my own fucking hands." (*Id.*). Detective Kitzmiller told Jackie, Tim, and Davis to walk home.

{¶6} Detective Kitzmiller then testified about his subsequent interaction with the trio that night after a 911 dispatcher advised him a person was laying in the middle of the road. The detective's body camera video showed Detective Kitzmiller talking to Davis, Jackie, and Tim, who had blood all over his shirt. (State's Exhibit B-2). Detective Kitzmiller asked them what happened. Jackie kept saying, "He punched me twice." (*Id.*). She also said, "I punched him, take me"; "I punched, kicked him"; and, "I wanted to kick him in the face so bad." (*Id.*; Mar. 7, 2023 Tr. at 490, 492). Davis then said, "Tim, tell Jackie to hush. I'm the one who put hands on the dude." (*Id.*). Jackie responded, "Well, he deserved it!" and "Is he still laying in the road? 'Cuz I want to go finish him." (State's Exhibit B-2).

-4-

{¶7} Benedict was the person laying in the road, he never regained consciousness, and he succumbed to his injuries on November 4, 2021. (State's Exhibit K). The autopsy report indicated his cause of death was "[a]noxic/hypoxic brain injury," as a consequence of "[m]ultiple blunt force injuries sustained in an assault by others." (*Id.*).

{¶8} Kris Kegley ("Kegley") was also called to testify. On the night in question, Kegley was sleeping at his house with the windows open. He heard male voices arguing outside, stuck his head out the window, and saw two men in the road squaring up to fight, along with another man and a woman standing off to the side. One of the fighters got knocked over and was on the ground, and the other started stomping and kicking him in the head about ten to twelve times. Kegley testified he yelled, "that's enough" out his window, then ran downstairs and called 911.

{¶9} Kegley explained that, while he was on the phone with the 911 dispatcher, the three people came back to the man on the ground. Kegley testified: "One of them mounted, mounted the already incapacitated victim and continued to beat him, full on UFC mount style, punched him about 30 times, then they, then they got up and the two males started kicking him in the head again, stomping him into the pavement." (Mar. 8, 2023 Tr. at 787). When asked if the woman came to help Benedict, Kegley answered "Not at all." (*Id.*). From his vantage point about 75 feet away, Kegley saw the woman rear back, yell "mother fucker," and kick the

man on the ground in the head. Kegley testified that he could hear the man on the ground gurgling.

{¶10} Kegley testified that his view was unobstructed. However, he also admitted telling a police officer afterward that his vantage point was "quite a ways away," it was dark, he could not make out faces, it was happening fast, and he was half asleep. (*Id.* at 846-847). At the time, Kegley could not identify who was involved, but he later found out that he knew two of the people involved—Jackie and Tim—because they had previously rented property from him.

{¶11} Next to testify for the State was Davis, who agreed to cooperate with the State and had testified for the State at Tim's trial. Prior to Davis' testimony, outside the presence of the jury, the judge and counsel for both parties discussed Davis' possible testimony regarding his plea deal. Jackie's counsel wanted to elicit from Davis—who was cooperating with the State—the exact amount of prison time he could receive *without* his plea deal. For example, he wanted to confront Davis about facing the possibility of life in prison without parole on the aggravated murder charge against him.

{¶12} The trial court ruled that counsel could elicit from Davis that he was "facing significantly more time" in prison without his plea deal, but not the specific potential sentence. (Mar. 8, 2023 Tr. at 898). This was because the jury knew Jackie and Davis faced the same charges, so if the jurors found out Davis' potential punishment then they would know the potential punishment Jackie was facing,

which could affect their verdict. The following exchanges then took place during

Davis' direct and cross-examination testimony:

| | |
|---|---|
| [Prosecutor:] | Now, in exchange for your cooperation, what is the deal that you believe you got as far as sentencing goes? |
| [Davis:] | Sentencing, ah, I agreed and plead out to manslaughter, felonious assault and obstruction of justice for a total of 20 years, but, ah, like an uncontested Judicial [release] after 10 as long as I, as long as I behave and stuff, I should be able to do Judicial [release] after 10 years. |
| [Prosecutor:] | Okay. Now, as explained to you, the legal possibilities, it's possible that you can get out after ten years, but there's no promises either way? |
| [Davis:] | Yes. |

* * *

| | |
|---|---|
| [Defense counsel:] | [This deal] [c]alls for you to cooperate with the State of Ohio and testify whenever called upon, yes? |
| [Davis:] | That's correct. |

* * *

| | |
|---|---|
| [Defense counsel:] | So if you can go off to the prison, just keep your nose clean in as little as, a little more than eight and a half years, you could be home with your kids, right? |
| [Davis:] | Yes, sir. |
| [Defense counsel:] | Now, that was not going to be the situation if you didn't make this deal, right? |

| | |
|---|---|
| [Davis:] | Correct. |
| [Defense counsel:] | In fact, it was made clear to you by [your lawyer] that you were facing significantly more than the 10 or 20 years that you're talking about here, right? |
| [Davis:] | Yes, sir, I was facing – |
| [Defense counsel:] | Significantly more than the 20 years, right? |
| [Davis:] | Yes, I was facing 25 years. |
| [Court:] | Okay, hold on, stop, stop, all right.  * * * |

(*Id.* at 912, 938, 940-41).

**{¶13}** The judge then sent the jury out of the courtroom and explained to Davis that he was not allowed to testify as to the penalties that he was actually facing.  Jackie's counsel argued, "25 years is what [the jury has] heard, which is not significantly more than 20."  (*Id.* at 943).  He then asked the judge to "tell the Jury that there's more to it than just what [Davis] started to say, you should disregard all of it and not speculate."  (*Id.* at 944).  The next morning, outside the presence of the jury, the judge explained the dilemma, where Jackie's counsel did not want the jury to think Davis faced only 25 years in prison while the prosecution did not want the jury to be told he faced life in prison.  The judge said the parties had come up with a stipulation regarding what to tell the jury, although Jackie was not waiving her objection to being unable to elicit from Davis the exact amount of prison time he could receive *without* his plea deal.  The judge instructed the jury:

> THE COURT: * * * At the end of yesterday's testimony, you heard the beginning of an answer from the witness regarding the sentence and his plea deal, you're instructed to disregard that answer. The parties in this case agree that the witness, Cameron Davis, was facing a significantly greater sentence than the one in his agreement, and that's all the information you're going to get on that matter; do you understand? Okay, and that's all you can consider.

(Mar. 9, 2023 Tr. at 964).

{¶14} Turning to the particulars of Davis' testimony, Davis was Jackie and Tim's neighbor and was friends with them. He testified that, after leaving the bar on the night of the incident, Tim saw Benedict on the street, pointed him out to Davis, and told Davis: there's "that mother F'er that hit you in the face." (Mar. 8, 2023 Tr. at 920). According to Davis, he approached Benedict with the intention of making a peace offering, but they ended up fighting. Davis punched Benedict, Benedict fell onto the ground, and then Davis punched and kicked him. Davis then started walking away while Tim and Jackie walked up to Benedict. Tim repeatedly hit Benedict with elbows while Benedict was laying on the ground. Davis testified that Jackie then went up to Benedict, yelled at Tim that was enough and to stop, Tim ended up stopping after kicking Benedict, "and then Jackie went and like punched [Benedict] in the head and then kicked him in the head once that I saw." (*Id.* at 926). In contrast to Kegley's testimony, Davis did not hear Jackie say anything.

{¶15} The trio then walked away and were soon stopped by Detective Kitzmiller. Davis admitted he initially told Detective Kitzmiller that he was the one who did everything to Benedict, but that was a lie. According to Davis, he initially

took all the blame because he did not realize the severity of the situation and Benedict's injuries; Davis thought he would be charged only for simple assault due to fighting.

{¶16} Jackie testified in her own defense. According to Jackie, at the bar, Davis had been called a racist name; Jackie told Benedict not to be racist; Benedict shoved her; Jackie shoved him back; and then Benedict shoved her harder and she fell and got hurt. Jackie said that she was very drunk that night. Turning to the time after they left the bar, Jackie denied kicking or punching Benedict, and she denied yelling "mother fucker" at him. She admitted to throwing a kick, but said she kicked *Tim* in the face. She said she had meant to kick Tim in the chest area to get his attention and get him to stop hitting Benedict "[b]ecause he was beating on Michael Benedict after [Davis] done beat him up." (Mar. 10, 2023 Tr. at 1243). According to Jackie, she had also told Tim to stop and grabbed his shirt.

{¶17} Jackie admitted to initially lying to a detective about not remembering what happened. According to Jackie, she lied because she did not want to get Davis or Tim in trouble. She testified Tim had been repeatedly punching Benedict in the face while Benedict was laying on the ground motionless. She also testified Davis was in the initial fight with Benedict after they left the bar, and (contrary to Davis' testimony) Davis also repeatedly kicked Benedict while Tim was punching Benedict in the face—all while Jackie stood further away.

{¶18} Jackie testified that her statements to Detective Kitzmiller were just her being stupid. Specifically regarding her statement about wanting to kick Benedict "in the head so bad," Jackie claimed she said it "because [she] was mad, because they were arresting [her] husband." (*Id.* at 1338). According to Jackie, she did not actually mean what she had said and she had not hit Benedict.

{¶19} On rebuttal, the State called Kegley back to the witness stand. Kegley testified that Tim was walking away at the time Jackie kicked Benedict. He further testified there was absolutely no way, based on what he saw, that Jackie could have been kicking Tim off Benedict.

{¶20} The case was then submitted to the jury on three counts. The jury found Jackie guilty of Count Three, felony-murder in violation of R.C. 2903.02(B). The jury found Jackie not guilty of the other two remaining counts. The trial court then sentenced Jackie to a term of imprisonment of 15 years to life, pursuant to R.C. 2929.02(B)(1). (Apr. 12, 2023 Sentencing Entry). This appeal followed.

## II. ASSIGNMENTS OF ERROR

{¶21} Jackie raises two assignments of error for our review:

### First Assignment of Error

**Appellant's rights of confrontation under the state and federal constitutions were violated and the trial court abused its discretion by restricting cross-examination into the amount of prison time a cooperating co-defendant saved with a plea deal.**

## Second Assignment of Error

**Appellant's conviction is against the weight of the evidence.**

### III.   DISCUSSION

#### A.      First Assignment of Error

{¶22} In the first assignment of error, Jackie asserts that her rights of confrontation under both the state and federal constitutions were violated by the trial court restricting cross-examination into the amount of prison time Davis saved with his plea deal.  She argues, "the jury was left with the false impression that Davis's plea merely reduced a twenty-five year sentence to twenty, with the possibility of judicial release after serving ten years.  The jury was never given the information necessary to accurately evaluate Davis's credibility."  (Appellant's Brief at 19).

##### 1.      Standard of Review

{¶23} "When a defendant challenges a trial court's limitation on cross-examination on appeal, the standard of review turns on the nature of the limitation." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 172.  Limitations that deny a defendant the opportunity to *establish* that the witnesses may have had a motive to lie infringe on core Sixth Amendment rights and are reviewed de novo. *Id.*, citing *State v. Gonzales*, 1st Dist. Hamilton No. C-010757, 2002-Ohio-4937, ¶ 45.  On the other hand, if a trial court allowed cross-examination "'to expose a motive to lie,' then 'it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury.'"  *Id.*,

quoting *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir.1994). "Under those circumstances, the extent of cross-examination is within the sound discretion of the trial court." *Id.*

{¶24} Here, as shown above, the jury heard details of Davis' plea agreement, including the offenses he was pleading to, his understanding of the sentence he would receive in exchange for cooperating, and his obligation to testify whenever called upon by the State. Additionally, the jury heard that Davis' lawyer made it clear to Davis that he was facing a significantly longer sentence than the sentence he would receive in exchange for cooperating. Thus, the jury heard Davis' motive to lie, "[b]ut counsel was not permitted to explore the issue to the extent counsel desired to 'hammer it home' to the jury." *Gonzales*, 2002-Ohio-4937, at ¶ 47. Consequently, this case does not concern Jackie's "core Sixth Amendment rights, and our review is for abuse of discretion." *Id.*; *see also State v. Montgomery*, 3d Dist. Crawford No. 3-23-05, 2023-Ohio-4472, ¶ 28-30 (reviewing for abuse of discretion); *State v. Lundgren*, 73 Ohio St.3d 474, 487, 653 N.E.2d 304 (1995) ("no abuse of discretion occurred, since [defendant] had a full opportunity to demonstrate the bias or prejudice of each of these accomplices"). An abuse of discretion implies more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Amburgey*, 33 Ohio St.3d 115, 117, 515 N.E.2d 925 (1987).

### 2. Applicable Law

**{¶25}** The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Sixth Amendment to the U.S. Constitution. "[T]his bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The right of confrontation "'means more than being allowed to confront the witness physically.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), quoting *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The essential purpose of confrontation is to secure for the accused the opportunity of cross-examination. *Id.* Furthermore, "'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" *Id.* at 678-679, quoting *Davis* at 316-317.

**{¶26}** Yet, "[i]t does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Id.* at 679. "Trial courts have 'wide latitude * * * to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, at ¶ 170,

-14-

quoting *Van Arsdall,* 475 U.S. at 679; *see also Van Arsdall*, 475 U.S. at 679 (the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination in whatever way, and to whatever extent, the defense might want). Additionally, "when a defendant faces the same charges as the witness face[s], 'to inform the jury of the specific penalties available against the witnesses before and after their pleas would also inform the jury of the penalties the [defendant] faced,'" potentially leading to unfair prejudice. *State v. Price*, 9th Dist. Summit No. 28291, 2017-Ohio-4167, ¶ 6, quoting *State v. Gresham*, 8th Dist. Cuyahoga No. 81250, 2003-Ohio-744, ¶ 10.

{¶27} Looking to the Ohio Constitution, Jackie does not claim she was entitled to greater or different rights or protections under the State Constitution than the U.S. Constitution. Further, the Ohio Supreme Court has said Section 10, Article I of the Ohio Constitution provides no greater right of confrontation than the Sixth Amendment. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 12; *see also* Ohio Constitution, Article I, Section 10 ("In any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face").

### 3. Analysis

{¶28} We first address Jackie's argument that the jury was left with the false impression that Davis' plea merely reduced a twenty-five-year prison sentence to twenty years, with the possibility of judicial release after ten years. The trial court gave the stipulated instruction to address this alleged false impression. There is a

presumption that jurors follow the instructions given by a trial court judge. *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 106. We must presume that the jurors followed this instruction, and Jackie has not rebutted this presumption. *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, ¶ 226.

**{¶29}** Next, regarding the alleged violation of her confrontation rights due to the trial court restricting cross-examination into the specific amount of prison time Davis saved with his plea deal, we addressed this same issue in Tim's appeal of his convictions. Like the argument in this case, Tim had claimed "the trial court should not have limited the discussion about the potential sentence Davis could have received without the plea agreement." *Montgomery*, 2023-Ohio-4472, at ¶ 28. There, as here, "[t]he trial court did not allow the defense to mention that by reaching the agreement, Davis potentially avoided a sentence of 15 years to life in prison"; "[i]nstead, the trial court limited the defense to saying that by accepting the plea offer, he 'avoided some significant and substantial prison time.'" *Id.* We found no abuse of discretion:

> As long as the defense has the opportunity to question testifying co-defendants regarding the full benefits of their plea agreements and demonstrate the bias or prejudice of the co-defendants, the trial court does not err by limiting cross-examination on speculative issues. *Lundgren, supra.*

> A review of the record shows that Montgomery was able to question Davis about the plea agreement. Counsel for Montgomery specifically asked Davis what offenses he would be admitting via a guilty plea and the sentence he would receive. Davis admitted that he took the offered deal because the prosecutor would recommend a sentence of 20 years

in prison, but with early release, he 'would come home in ten years.' Tr. 292. Notably, the defense did not ask Davis if he had 'avoided some significant and substantial prison time' when questioning him, despite being permitted to do so. The exact amount of time that he was avoiding was speculative since no one knew what verdicts a jury would return if Davis had taken the case to trial. Since the defense had the opportunity to question Davis about the plea agreement and was able to demonstrate the benefits Davis received, the trial court did not err by limiting discussion about what potential sentence Davis may have received if he was convicted of the original charges. *Lundgren, supra*.

*Id.* at ¶ 29-30.

**{¶30}** The same analysis and conclusion applies here, arguably even more strongly because Jackie's counsel actually did ask Davis, as permitted, if he was facing significant prison time if he did not make the plea deal. *See also Gresham*, 2003-Ohio-744, at ¶ 7-9 (no abuse of discretion where trial court allowed defense to ask cooperating co-defendant if there was a substantial difference in the potential penalties faced with the plea deal versus without the plea deal, but did not allow questions comparing the specific penalties); *State v. Price*, 9th Dist. Summit No. 28291, 2017-Ohio-4167, ¶ 4-8 (no abuse of discretion where trial court did not allow questioning co-defendant about the specific sentence he faced without the plea deal, and co-defendant acknowledged "the plea agreement provided a 'significantly reduced' potential sentence"). In conclusion, the trial court did not abuse its discretion in restricting cross-examination into the specific amount of prison time Davis may have saved with his plea deal.

{¶31} Jackie's first assignment of error is overruled.

## B.      Second Assignment of Error

{¶32} In the second assignment of error, Jackie contends her conviction was against the manifest weight of the evidence.  As set forth above, the count for which Jackie was convicted included charging Jackie with aiding and abetting Tim and Davis in committing felony-murder.  In line with Jackie's specific arguments in this assignment of error, we will focus on this complicity theory, rather than the principal offender theory.

{¶33} Jackie argues that "[t]he evidence in this case, when properly weighed, does not support a finding of guilty on a theory of aiding and abetting." (Appellant's Brief at 20).  Instead, according to Jackie, the credible evidence showed that she "just wanted to go home, tried to separate the parties and prevent a fight, and tried to stop Tim from beating Benedict any further." (*Id.* at 22).  She says she "should not be punished simply for being present." (*Id.*).  She also criticizes the police investigation as "faulty," Kegley as having "severe credibility issues," and Davis as an unreliable witness. (*Id.* at 21-22).

### 1.      Standard of Review

{¶34} The "manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 26.  "[W]e review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether

in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Yet, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119. To reverse a judgment from a jury trial on the weight of the evidence, all three appellate judges must concur. Ohio Constitution, Article IV, Section 3(B)(3).

### 2. Applicable Law

{¶35} Assessing a violation of R.C. 2903.02(B) under a theory of aiding and abetting another to commit felony-murder involves multiple statutes. First, the felony-murder statute states:

> No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C. 2903.03 or 2903.04].

R.C. 2903.02(B). "The felony-murder statute imposes what is in essence strict liability." *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, ¶ 9. "Though intent to commit the predicate felony is required, intent to kill is not." *Id.* In other words,

"a person can be convicted of [felony-murder] even though the death was unintended." *Id.* at ¶ 10.

**{¶36}** Next, the alleged predicate offense in this case was felonious assault, in violation of R.C. 2903.11(A)(1). It qualifies as a predicate offense for felony-murder because it is an offense of violence that is a second-degree felony and is not a violation of R.C. 2903.03 or 2903.04. *See* R.C. 2901.01(A)(9)(a); R.C. 2903.11(D)(1). The felonious assault statute provides, in relevant part: "No person shall knowingly * * * [c]ause serious physical harm to another * * *." R.C. 2903.11(A)(1).

**{¶37}** Finally, Jackie was charged under a complicity theory, specifically aiding and abetting Tim and Davis. The complicity statute provides:

> (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * *
>
>> (2) Aid or abet another in committing the offense;
>
> * * *
>
> (B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.
>
> * * *
>
> (F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.

R.C. 2923.03(A)(2), (B), (F). The statute "does not provide a definition of the terms 'aid or abet.'" *State v. Johnson*, 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001). Instead, the Ohio Supreme Court has held:

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*Id.* at syllabus. "'[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.'" *Id.* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). This "is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Id.* However, "'participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶38} Given that the culpability to commit felonious assault is "knowingly," the culpability required for the commission of felony-murder with a predicate offense of felonious assault is "knowingly." R.C. 2903.11(A)(2); *see also State v. Wynn*, 2d Dist. Montgomery No. 25097, 2014-Ohio-420, ¶ 64. Therefore, the State was required to prove that Jackie aided or abetted Tim and Davis in committing a felonious assault and shared in their intent to knowingly cause serious harm to

Benedict, which proximately caused Benedict's death. *See Johnson* at syllabus. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.*

### 3. Analysis

{¶39} Having reviewed the record, we do not find that this is an exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice by convicting Jackie for complicity in the commission of felony-murder. The jury was faced with two competing narratives based on the evidence: Jackie was actively involved in the serious physical harm to Benedict that caused his death *or* Jackie was an innocent bystander who even sought to prevent the physical harm. Although evidence at trial showed that, during some portions of the night, Jackie was passive and sought to prevent physical harm, a significant amount of evidence supported that, during other portions of the night, she supported and was even actively participating in beating Benedict.

{¶40} First, the jurors watched body camera videos that captured several incriminating statements Jackie made on the night in question. For example, outside the bar, and with her husband Tim standing by her, Jackie said Tim "should have [fought Benedict] when he punched me." (State's Exhibit B-1). Later, after Benedict had been beaten in the road, Jackie said to Detective Kitzmiller: "I

-22-

punched him, take me," "I punched, kicked him," and "I wanted to kick him in the face so bad." (State's Exhibit B-2). Additionally, in response to Davis' statement that he was "the one who put hands on the dude," Jackie responded: "Well, he deserved it!" and "Is he still laying in the road? 'Cuz I want to go finish him." (*Id.*).

{¶41} Second, the jurors were presented with incriminating testimony. To start, Jackie testified about Davis and Tim severely beating Benedict. In other words, she acknowledged they caused him serious physical harm. It also is undisputed that Benedict died from his injuries. Additionally, eyewitnesses testified about Jackie's active participation in the beating. For example, Kegley testified that, from his unobstructed vantage point 75 feet away, he saw the woman (Jackie) rear back, yell "mother fucker," and kick the man on the ground in the head. Likewise, Davis testified that, after Tim stopped kicking Benedict, "Jackie went and like punched [Benedict] in the head and then kicked him in the head once that I saw." (Mar. 8, 2023 Tr. at 926).

{¶42} This evidence supported a conclusion that Jackie—at the least—supported, assisted, encouraged, cooperated with, or incited Tim and Davis in their assault on Benedict and shared in Tim and Davis' criminal intent. Setting aside the evidence that Jackie actually hit Benedict, the evidence demonstrated she supported Tim and Davis in causing serious physical harm to Benedict and had reason for taking revenge on Benedict. This is evidenced from the statements she made that Benedict "deserved it," wanting to "finish him." *See Johnson*, 93 Ohio St.3d at 244

(defendant accompanied the principal offender as protection and support and had his own reason for revenge because he himself had been shot at earlier that day); *State v. Gardner*, 8th Dist. Cuyahoga No. 111506, 2023-Ohio-307, ¶ 39 ("[a] reasonable inference that [defendant] possessed the intent of the assailants could be made from [defendant's] statement [after the victim's death] that [victim] 'caused his own s***, he took s*** from me'"). Therefore, evidence at trial supported the premise Jackie aided or abetted Tim and Davis in feloniously assaulting Benedict and shared in their intent to knowingly cause serious physical harm to Benedict, which caused his death.

{¶43} Jackie attacks the credibility of Kegley and Davis. We have considered the credibility of the witnesses and do not find the jury "clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, at ¶ 168; *see also State v. McDonald-Glasco*, 10th Dist. Franklin No. 17AP-368, 2018-Ohio-1918, ¶ 40 (conviction for complicity in the murder was not against the manifest weight of the evidence; "it is within the province of the jury to believe [co-defendant's] testimony in spite of his admitted involvement and plea agreement with the state").

{¶44} Jackie's second assignment of error is overruled.

**IV.    CONCLUSION**

**{¶45}** For the foregoing reasons, Appellant's assignments of error are overruled.  Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Crawford County Court of Common Pleas.

***Judgment Affirmed***

**WILLAMOWSKI, P.J., and WALDICK, J., concur.**