[Cite as *State v. Alexander*, 2024-Ohio-2565.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

MATTHEW ALEXANDER,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 23 MA 0090, 23 MA 0091**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 20 CR 634

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor*,* and *Atty. Edward A. Czopur*, Assistant Prosecuting Attorney, Mahoning County Prosecutor's Office, for Plaintiff-Appellee and

*Atty. John B. Juhasz*, for Defendant-Appellant.

Dated: July 3, 2024

**HANNI, J.**

{¶1} Defendant-Appellant, Matthew Alexander, appeals from a Mahoning County Court of Common Pleas judgment convicting him of two counts of aggravated arson and one count of breaking and entering. He was sentenced to a total of 10-14 years in prison and ordered to register as an arson offender.

{¶2} Appellant argues on appeal that the State prevented him from presenting a defense due to the State's failure to preserve a gas grill that was a crucial piece of evidence. He also contends that his right of confrontation was denied when the trial court limited cross-examination of his co-defendant, Ashley Levin, at trial. Appellant lastly asserts that the court abused its discretion by sentencing him to a term five times longer than Levin.

{¶3} For the following reasons, we affirm Appellant's conviction and sentence.

## FACTS OF THE CASE

{¶4} On September 9, 2020, Appellant and Levin were at a bar drinking and one of them asked a man at the bar if he knew where to buy drugs. The man was not identified at trial and it was not established if either Appellant or Levin knew the man. The three left the bar in Levin's car to buy drugs. The man gave Levin directions and Appellant gave the man $100 for drugs. Upon arriving at a house, the man left the car to buy the drugs, but he never returned.

{¶5} After waiting a few minutes, Levin exited her car and approached the front door of the house. She knocked on the door and the homeowner, Angela Schneider, answered. The entire conversation between the two is unclear, but Angela told Levin that she had no idea about the man or drugs. Angela told Levin to leave. When Appellant thereafter approached, Angela slammed the door shut and called 911.

{¶6} Appellant and Levin returned to her car and started to drive away, but stopped a little distance away from Angela's house. A camera mounted in Angela's carport shows Levin walking into the carport, which is adjacent to her garage. The garage was adjacent to the home. Levin walked into the carport, picked up a gas can, and poured

gasoline into and over a propane grill, a lawnmower, and children's bikes. She attempted to light the grill, but it did not ignite. She walked away from the grill.

{¶7} The carport camera then shows Appellant entering the carport and walking over to the grill while Levin is pouring gas around the edges of the carport. Appellant is then shown bending over the grill with his back to the camera, with only his left hand visible. The grill then ignited and flames burst out of it. The camera shows Appellant and Levin leaving the carport and walking down Angela's driveway.

{¶8} Angela viewed the video and again called 911. The fire department came and extinguished the fire.

## PROCEDURAL HISTORY

{¶9} Appellant and Levin were indicted for: aggravated arson in violation of R.C. 2909.02(A)(1), a first-degree felony; aggravated arson in violation of R.C. 2909.02(A)(1), a second-degree felony; aggravated burglary in violation of R.C. 2911.11(A)(1)(B), a first-degree felony; and breaking and entering in violation of R.C. 2911.15(A)(C), a fifth-degree felony. The State dismissed the aggravated burglary charge before trial.

## MOTION HEARING

{¶10} On August 18, 2021, Appellant filed a motion to dismiss his case or in the alternative to bar the State from showing the carport video. He asserted that the State allowed the grill to be destroyed even though it was a key piece of evidence in the case.

{¶11} Appellant contended that the Austintown Police Department (APD) and Fire Department (AFD) failed to secure and preserve the grill in the criminal investigation. He indicated that he had filed a motion to compel the production of the grill and the State told him that Angela disposed of it due to damage. Appellant asserted that Levin lit the grill, but it did not ignite until she walked away and he walked up to it. He argued that since he could not have an expert inspect and evaluate the grill, its controls, and its ignition system, he had no way to present a defense that Levin actually lit the grill and it failed to ignite until he was standing in front of it.

{¶12} Appellant noted that his counsel spoke to experts who could examine the grill and opine about its ignition system and mechanical operability. He asserted that the

failure to preserve the grill violated his federal and state constitutional rights to due process and double jeopardy under *Brady v. Maryland,* 373 U.S. 83 (1963), *Arizona v. Youngblood,* 488 U.S. 51 (1988), and *State v. Geeslin*, 2007-Ohio-5239.

**{¶13}** Alternatively, Appellant requested that the court bar the State from using the videotape of the fire at trial and any testimony regarding the grill's mechanical operability or ignition. He asserted that the videotape failed to show the entire incident and he would be unable to defend against the inference that he caused the fire without examining the grill. The State responded, asserting that the grill was not materially exculpatory evidence and Appellant could not prove that the State acted in bad faith by failing to preserve the grill.

**{¶14}** The court held a hearing on the motion, with Captain Marcum of the AFD and Detective Sergeant McGlynn of the APD, testifying for the State. The court allowed briefing on the matter after the hearing.

**{¶15}** On May 5, 2022, the court issued a judgment entry denying Appellant's motion. The court held that the grill was "potentially useful" and not "materially exculpatory" evidence and the prosecution did not act in bad faith by making the grill unavailable because it had no hand in its disposal before Appellant requested to examine it.

### TRIAL

**{¶16}** At trial, counsel for Appellant again raised the issue of grill preservation and requested the exclusion of statements and testimony of Levin, Captain Marcum, and Detective Sergeant McGlynn about the grill. (Tr. at 272). The court noted that since its initial ruling on that issue Levin had entered a guilty plea, was sentenced, and was going to testify as a witness for the State in Appellant's trial. (Tr. at 272). The court indicated that it would grant Appellant's counsel great leeway to cross-examine witnesses on this issue. (Tr. at 273).

**{¶17}** At trial, Angela, Captain Marcum, Detective Lea Rozzo of the APD, Levin, and Detective Sergeant McGlynn testified for the State. Appellant testified on his own behalf.

Case Nos. 23 MA 0090, 23 MA 0091

**{¶18}** Angela testified that her garage is attached to her house, and the carport is attached to the garage. (Tr. at 240). She stated that two bedrooms are located above the carport and one of her children occupies a bedroom. (Tr. at 240).

**{¶19}** Angela recalled that on September 9, 2020, she and two of her children were sleeping when her dog's barking awakened her because someone was pounding on her front door. (Tr. at 241). She observed a blonde female, later identified as Levin, on her porch and she opened the door. (Tr. at 241). She testified that Levin asked, "Where's my blow?" and when Angela stated, "excuse me?" Levin told her that Levin's boyfriend came there to get cocaine. (Tr. at 242). Angela testified that as she told Levin that she was mistaken, a very tall and big man appeared on her porch and she slammed the door closed. (Tr. at 242). She stated that she did not know what Levin was talking about and she called 911 to report the incident. (Tr. at 242-244).

**{¶20}** Angela identified Appellant as the male on her porch with Levin. (Tr. at 243). She stated that she called 911 again after the camera installed in her carport showed that the same people who knocked on her door had lit her carport on fire. (Tr. at 245). She explained that cameras and a security system were already installed in the house when she bought it and she and the police figured out how to make a copy of the camera contents. (Tr. at 246). She watched portions of the video with the assistant prosecutor and the jury and she verified those portions. (Tr. at 254-256).

**{¶21}** When asked about her grill, Angela testified that it ignited by turning the gas on and pushing a button. (Tr. at 256). She explained that the grill never malfunctioned before. (Tr. at 257). She also testified that she cleaned the carport a couple of days later and disposed of the bikes, the grill, and the lawn mower due to fire and smoke damage. (Tr. at 259). She stated that one of the cameras showed the car that Levin and Appellant drove that night, so she posted a description of the car on the Nextdoor app. (Tr. at 259). She reported that someone messaged her and told her that Levin owned the car. (Tr. at 259). Angela testified that she looked Levin up on social media and identified her as the female at her door and in her carport on the night of the fire. (Tr. at 259). She called the detective on the case, who returned her call and told her that Levin had admitted her presence at the scene. (Tr. at 259). Angela stated that the cost to repair her carport is

over $4,000 and her children just started sleeping in their own beds because they had been frightened by the incident. (Tr. at 260).

**{¶22}** On cross-examination, Angela testified that the APD never asked her to save the grill or if they could take it. (Tr. at 265).

**{¶23}** Captain Marcum testified. (Tr. at 278). He stated that when he arrived on the scene, he observed smoke coming from the carport and a small amount of flames. (Tr. at 282). He spoke to Angela and recalled her telling him that moments before she called 911 about the fire, a blonde female pounded on her door and asked where her "blow" was and said "he took my money. We want our money." (Tr. at 283). He stated that Angela advised that she saw a red convertible with a tan top by her house. (Tr. at 284). She also advised him that a camera was mounted in the carport which captured the fire. (Tr. at 285).

**{¶24}** Captain Marcum outlined his investigation of the fire, identified pictures of the carport, and reported that he saw a red, five-gallon gas can located in the carport. (Tr. at 285-289). He concluded that gas had been poured as an accelerant. (Tr. at 285). He testified that he saw the grill, the lawn mower, and the bikes in the carport and he did not preserve the grill because the fire department had limited storage space and the grill would require storage in a fire-proof/explosion-proof container. (Tr. at 291-292). He also stated that the fire department thought it was unnecessary to preserve the grill after they learned that the incident was recorded. (Tr. at 292). He did secure the gas can in the garage in case testing was necessary. (Tr. at 292).

**{¶25}** Captain Marcum testified that Detective Sergeant McGlynn later reported that they were able to identify the car that left the house on the date of the incident. (Tr. at 294). He indicated that a few days later, Detective Sergeant McGlynn told him that he had positively identified the female who owned the car and a videotape of the incident was made from the camera in the carport. (Tr. at 295).

**{¶26}** On cross-examination, Captain Marcum did not recall Levin telling Detective Sergeant McGlynn that she started the fire. (Tr. at 303). He stated that he was present during Detective Sergeant McGlynn's interview of her and he recalled her admitting that she pushed the button on the grill three times, but it did not light. (Tr. at 308). When asked about Appellant's movements on the video near the grill, Captain Marcum stated

that it looked like Appellant did not put his hand up to his mouth, but rather, he touched his beard. (Tr. at 310). He also could not tell what Appellant was doing when he was bent over the grill. (Tr. at 311). He said the same about Levin, who was also captured on the video stooped down, level with the grill. (Tr. at 311).

{¶27} Captain Marcum testified that the video of the fire showed that the flames started in the belly of the grill where the fuel source was located, and gas had been poured into that area. (Tr. at 314). He discussed allegedly contrary statements that he made at the motion hearing, but he agreed that fumes were placed in the environment when Levin poured gas into the grill, onto the bikes, and around the edges of the carport. (Tr. at 318).

{¶28} Appellant's counsel asked Captain Marcum if additional fumes would be created in the environment if the propane tank to the grill was turned to the "on" position. (Tr. at 318). He responded that no propane fumes were located in the environment because the valves for the burners on the grill were in the "off" position. (Tr. at 318). Appellant's counsel seemed surprised and asked why this was not in Captain Marcum's report. (Tr. at 319). Captain Marcum testified that it was usually more important to include when the knobs are in the "on" position and not the "off" position. (Tr. at 320). He explained that he inspected the grill immediately on the scene, but did not preserve it. (Tr. at 319). He reasoned that it was not important to preserve the grill because the fire progressed consistent with a gas fire and not with propane. (Tr. at 320). Captain Marcum also stated that the camera in the carport moved out of its position due to the explosion of the gas on the lawn mower, not from the propane tank. (Tr. at 324). He noted that the video showed that no fire was coming out of the propane tank. (Tr. at 325).

{¶29} Appellant's counsel also asked Captain Marcum about whether a vape pen could have ignited the fire and he responded that he was not familiar with vape pens. (Tr. at 321). He indicated that when he watched the video, he did not see a vape pen. (Tr. at 322).

{¶30} On redirect examination, Captain Marcum testified that the gas was used as an accelerant and the video showed that Appellant bent over and then stood at the grill, facing the control panel right before the fire started. (Tr. at 329).

{¶31} Detective Rozzo testified. (Tr. at 345). She was on patrol the day after the fire and read summaries of the prior day's reports which outlined the fire and stated that

a red Toyota Solara with a tan top was involved. (Tr. at 347). She observed such a car in the parking lot of an apartment building and ran the license plate, which came back as belonging to Ashley Levin. (Tr. at 348).

**{¶32}** Detective Rozzo acknowledged past incidents with Levin, including prior overdoses at her apartment. (Tr. at 348). Detective Rozzo returned to Levin's apartment building and neighbors told her that Levin recently resided with a man who drove a white truck with Arizona license plates. (Tr. at 350). Detective Rozzo ran the plate and it was registered to Appellant. (Tr. at 350).

**{¶33}** Ashley Levin then testified. (Tr. at 353). She was romantically involved with Appellant during the relevant time period. (Tr. at 357-358). She stated that he came to her house on the day of the fire with cocaine, they ingested the cocaine, and she then drove them to Chipper's Bar in Austintown, Ohio in her red Solara with a tan top. (Tr. at 358-360).

**{¶34}** Levin stated that they began drinking at the bar. (Tr. at 360). She recalled that they wanted to buy more cocaine, so Appellant walked up to a man and asked him where they could buy cocaine. (Tr. at 361). Levin testified that they did not know the man, but he told Appellant he could get cocaine for them. (Tr. at 361). They got into her car and the man directed her to a house on Beverly Avenue, which was a few streets from Chipper's Bar. (Tr. at 362).

**{¶35}** Levin testified that they approached the house and as the man exited her car, she asked if she or Appellant could go with him to the house, but he said no. (Tr. at 362). She stated that Appellant handed the man a hundred-dollar bill and the man said that he would be right back. (Tr. at 362). She testified that it looked like the man went to the front of the house and knocked on the door, but she was not sure. (Tr. at 362). She recalled that he then went to the right of the house, then to the left, and then disappeared. (Tr. at 362). She and Appellant waited ten minutes, and she then walked up to the front door of the house. (Tr. at 364).

**{¶36}** Levin recalled that when Angela answered the door, Levin asked her where the man went and if she had their cocaine. (Tr. at 364). Levin stated that Angela told her she did not know what Levin was talking about and then shut the door when Appellant appeared behind Levin. (Tr. at 364). She recalled that she and Appellant returned to her

car and she was upset because the man stole Appellant's money. (Tr. at 365). She also thought that Angela lied to her and also stole the money. (Tr. at 365).

{¶37} Levin testified that she drove her car to the other side of Angela's driveway and exited her car without speaking to Appellant. (Tr. at 365). She related that she picked up a gas can located in the carport and began dumping it on the bikes, the grill, and other items. (Tr. at 366). She recalled touching the control panel on the grill, but it did not light. (Tr. at 366). She stated that she also bent down and touched the propane tank, but it still did not ignite the grill. (Tr. at 366).

{¶38} Levin related that as she walked out of the carport, Appellant walked in and she grabbed his arm and told him they should leave. (Tr. at 367). She testified that he proceeded to walk in and touch the grill as she poured more gasoline. (Tr. at 367). She recalled that she heard the ignite button on the grill click three or four times and it then erupted in flames. (Tr. at 367). She stated that Appellant was standing at the control panel of the grill when she heard the clicking. (Tr. at 367). She testified that the grill caught on fire and they ran out of the carport to her car and drove away. (Tr. at 368). She stated that she was going to call 911, but saw the fire truck coming toward the house. (Tr. at 368). She drove to her apartment and Appellant then left in his truck. (Tr. at 368).

{¶39} Levin recalled Detective Sergeant McGlynn calling her a few days later and Levin initially denied involvement in the fire because she was scared. (Tr. at 368-369). She stated that by the end of their conversation, she admitted her involvement, but told him that she and Appellant wanted to buy marijuana and not cocaine. (Tr. at 369). Levin called Appellant immediately after the phone call and told him about the conversation. (Tr. at 370). She recalled that Appellant said "okay" and told her that he needed to return to work. (Tr. at 370). She stated that Appellant came to her apartment afterward and they decided that she would go to the police station and talk to Detective Sergeant McGlynn. (Tr. at 370-371). She also testified that she did not observe Appellant with a vape pen at the fire. (Tr. at 372).

{¶40} Levin admitted reaching a plea agreement with the State in exchange for her testimony at Appellant's trial. (Tr. at 376). She entered a guilty plea to aggravated arson and breaking and entering, and the State agreed to recommend that she serve a

sentence of two to three years in prison. (Tr. at 376-377). She also read the jury a 2023 text message from Appellant that she thought was threatening. (Tr. at 382-384).

{¶41} On cross-examination, Appellant's counsel asked Levin about lying to the police about when she stopped using drugs and about telling Detective Sergeant McGlynn that she and Appellant wanted to buy marijuana and not cocaine. (Tr. at 388-389). She recalled telling Detective Sergeant McGlynn that she poured the gas to ruin the items in the carport or to make it smell bad to frighten Angela. (Tr. at 389). She admitted she was intoxicated that night and admitted to banging on Angela's front door. (Tr. at 390). She also admitted that she took a can of gas and poured it on the grill, touched the grill controls, and bent down low near the propane tank. (Tr. at 390).

{¶42} When asked if she was trying to turn off the grill, she testified that she did not know, but her intentions were not to start a fire. (Tr. at 392). She recalled telling Detective Sergeant McGlynn that there was no excuse for what she did. (Tr. at 394).

{¶43} Levin was asked about her plea bargain and she admitted that she could have been sentenced to many more years in prison if she would not have entered into it. (Tr. at 402-409). She admitted she has borderline personality disorder and was not taking her medication on the night of the fire. (Tr. at 409). She agreed that symptoms of her disorder when not on medication include impulsive actions and self-destructive behavior. (Tr. at 409-410).

{¶44} When asked about smirking while looking at the camera, Levin testified that she did not know that there was a carport camera and she would not have entered the carport if she knew a camera was inside. (Tr. at 410). She stated that she was smirking at Appellant. (Tr. at 434). She also testified that she has never seen Appellant with a vape pen at any time. (Tr. at 434-435).

{¶45} Levin also testified that although she was bent over at the propane tank and had poured gas on the floor, bikes, and grill, she was afraid that a fire would start and she was trying to make sure that the propane tank was turned off. (Tr. at 444). She acknowledged that it sounded ridiculous. (Tr. at 444). She also acknowledged that she was not thinking logically that night because she was intoxicated and had taken cocaine. (Tr. at 438, 446).

**{¶46}** Detective Sergeant McGlynn testified that the police did not go to the scene of the fire because the fire department had an arson investigator there. (Tr. at 451). The investigator prepared a report to supplement Captain Marcum's report to aid with the criminal aspect of the investigation. (Tr. at 451). He explained that he spoke to Officer Rozzo about prior dealings with Levin and he ran the license plate number obtained from the red Solara and it came back as registered to her. (Tr. at 453). He also ran the license plate number of the white truck given to him by Officer Rozzo which came back as registered to Appellant. (Tr. at 454). He obtained the Bureau of Motor Vehicles photographs of Appellant and Levin and compared them to the male and female on the video in the carport on the night of the fire. (Tr. at 458). He identified the two people involved in the fire as Appellant and Levin. (Tr. at 458).

**{¶47}** Detective Sergeant McGlynn testified that after identifying Appellant and Levin, he obtained Levin's phone number and called to see if she would speak to him about the fire. (Tr. at 460-461). He stated that initially, Levin was very hostile on the phone and denied her involvement. (Tr. at 461). He reported that by the end of their conversation, Levin was remorseful and honest about her involvement. (Tr. at 461). He testified that Levin called him back the same day and asked to meet in person. (Tr. at 462). They met the following day and Captain Marcum attended as well. (Tr. at 463). Detective Sergeant McGlynn indicated that Levin was very forthcoming at the meeting. (Tr. at 466).

**{¶48}** Detective Sergeant McGlynn identified screen shots from the carport camera which showed Appellant bent over the control panel of the grill with his left hand on his left knee and his right hand obscured from view. (Tr. at 468-469). A screen shot also showed Levin pouring gas along the side of the carport during this time. (Tr. at 469). Another screen shot showed Appellant was still hunched over the control panel, with his left hand on his knee, his right hand in front of his body towards the control panel of the grill, when flames erupted and started to engulf the grill. (Tr. at 470). He believed that the fire looked like it was located on top of the grill in the grill pan and at the bottom of the grill. (Tr. at 471).

**{¶49}** On cross-examination, Detective Sergeant McGlynn stated that he believed Levin when she said that she was trying to turn the grill off to stop a fire. (Tr. at 474). He

acknowledged that Levin stated during the interview that her actions of approaching the house and pouring the gas led to the fire. (Tr. at 475). He also testified that he was not insinuating that Appellant turned the gas or the control panel on, but rather that he pressed the ignitor on the grill which ignited the fumes and the gas that Levin poured on the grill. (Tr. at 479).

{¶50} Appellant testified, stating that he was married and worked as an automotive technician. (Tr. at 544-545). He recalled that he was working at an automotive shop in Boardman, Ohio on September 9, 2020 and had made plans to meet Levin after work. (Tr. at 547). He stated that he drove to her apartment and got out of his truck and right into her car to go to Chipper's Bar for dinner. (Tr. at 548). He stated that he took no illegal drugs that night. (Tr. at 548-549).

{¶51} Appellant recalled that they played pool at Chipper's Bar, ate dinner, and they drank tequila and beer. (Tr. at 551). He testified that they saw a man there with khaki shorts and Levin told him that the man was her boyfriend. (Tr. at 552). He stated that he did not know the man and he did not approach him to ask to buy cocaine. (Tr. at 553). He remembered that Levin approached the man to buy marijuana and he gave her $100 for it. (Tr. at 553).

{¶52} Appellant further testified that the man then drove with them in Levin's car because he needed a ride home and Levin was going to buy marijuana from him. (Tr. at 554). Appellant stated that Levin was in no condition to drive and when they arrived at Angela's house, the man got out of the car and went toward the house. (Tr. at 555).

{¶53} Appellant reported that he got out of the car and went to the carport area after they realized that he may have been robbed. (Tr. at 556). When he could not find the man, Appellant stated that he returned to the car and sat in the passenger seat. (Tr. at 556). He indicated that Levin walked to the front door of the house and he subsequently followed her. (Tr. at 557). He explained that Levin had already spoken to Angela by the time he approached the house and he presumed that they were going to return to the car, but Levin walked straight into the carport. (Tr. at 557). He stated that he returned to the car. (Tr. at 559).

Case Nos. 23 MA 0090, 23 MA 0091

{¶54} Appellant testified that he saw Levin pouring gas in the carport, so he exited the car. (Tr. at 559-560). He stated that he had a vape pen with him and Levin knew that he vaped because she had taken him to buy vape pens before. (Tr. at 562).

{¶55} Appellant stated that as he approached the carport, he had the vape pen in his hand and he said to her, "what the 'f'?" (Tr. at 563). He indicated that Levin smiled. (Tr. at 563). He testified that he went to shut the grill off because he saw Levin pouring gas and stooping down near the propane tank on the grill. (Tr. at 564). He stated that he walked directly to the grill, looked to see if it was in the "off" position, turned it off, and the flames erupted behind him. (Tr. at 565). He stated that he only turned the knobs to the "off" position. (Tr. at 565). He stated that he was scared and did not call 911, but he should have and regretted not doing so. (Tr. at 566).

{¶56} Appellant testified that he had contact with Levin after the fire and he later messaged her on Facebook and told her to tell the truth about the fire. (Tr. at 567). He stated that he did not see Levin ingest cocaine on the night of the fire and he had no intention of starting a fire that night or to take part in pouring gas all over the carport and pressing the ignition on the grill. (Tr. at 567).

{¶57} After trial, the jury convicted Appellant on the two counts of aggravated arson and breaking and entering. The trial court sentenced him to 10-14 years in prison, and Appellant filed the instant appeal raising three assignments of error.

{¶58} In his first assignment of error, Appellant asserts:

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DISMISS EVIDENCE BECAUSE THE ACTIONS OF THE GOVERNMENT IN FAILING TO PRESERVE A CRUCIAL PIECE OF EVIDENCE DESTROYED THE DEFENDANT'S ABILITY TO PRESENT A DEFENSE, DUE PROCESS, THE RIGHT TO DEFEND LIBERTY, AND THE RIGHT TO HAVE JUSTICE ADMINISTERED WITHOUT DENIAL, FREEDOMS, PROTECTED BY U.S. CONST., AMEND. XIV AND OHIO CONST. ART. I, §§ 1, 2, AND 16.**

{¶59} Appellant contends that the standard for determining whether he was denied protected access to the evidence used against him is an impossible one. He cites

*State v. South*, 2005-Ohio-2152 (9th Dist.), where the court acknowledged a defendant's constitutional guarantee to the same access to evidence that the State intends to use and uses at trial. There, the State used a videotape at trial and denied the defendant access to the tape despite his discovery requests. The State argued that even if it had violated the criminal discovery rule by refusing access to the videotape, the defendant could not prove he was prejudiced by the refusal because he offered only speculation that it would prove his innocence. *Id.* at ¶ 13.

{¶60} The Ninth District noted the circular reasoning of this assertion, asserting that the State essentially argued that a defendant "has not justified his right to a copy of the videotape upon which he might experiment in search of exculpatory evidence because he has not already proven that the experiment would produce exculpatory evidence." *Id.* The court held that all that this would show is that the defendant did not conduct experiments on a videotape that he did not have. *Id.*

{¶61} Appellant asserts that the same "dizzying" standard was applied here. He contends that he was unable to inspect the grill to search for exculpatory evidence because he did not show that an experiment would produce exculpatory evidence. Yet he could not show the experiment would produce exculpatory evidence because he had no access to the grill to find such exculpatory evidence. Appellant submits that the failure to preserve the grill thus violated his due process rights, his right to a fair trial, and his right to present a defense.

{¶62} Appellant contends that the trial court in this case too narrowly interpreted the State's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court held that constitutional due process is violated when a prosecutor suppresses evidence favorable to a defendant where the evidence is material to guilt or to punishment, regardless of the good or bad faith of the prosecution. *Id.* at 87. Appellant asserts that this "materially exculpatory" standard should be liberally applied.

{¶63} Appellant notes that the trial court instead applied the "potentially useful" standard from *Arizona v. Youngblood*, 488 U.S. 51 (1988), and the Ohio Supreme Court's opinion in *State v. Geeslin*, 2007-Ohio-5239. In *Youngblood*, the Court set forth the "potentially useful" standard in determining whether a criminal defendant is denied due

Case Nos. 23 MA 0090, 23 MA 0091

process when the State fails to preserve or loses evidence, as opposed to suppressing evidence:

> But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said then that it could have been subjected to tests, the results of which might have exonerated the defendant. * * * We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Id.* at 57-58.

{¶64} Appellant notes that while the Ohio Supreme Court has embraced the standard in *Youngblood*, it has not considered it under the Ohio Constitution. He emphasizes Article 1, section 1 of the Ohio Constitution, which protects inalienable rights, such as defending life and liberty, and Article 1, section 16, which require open access to the courts and due process of law.

{¶65} Appellant cites *Geeslin*, 2007-Ohio-5239, where the Court held that a defendant must show that the State acted in bad faith in destroying potentially useful evidence. He contends that many courts have criticized the standard in *Youngblood* because it requires a trial court to determine whether a piece of evidence is "potentially useful" or "materially exculpatory" without actually possessing the evidence to make that decision. He also asserts that the difference between "materially exculpatory" and "potentially useful" evidence is a distinction without a difference.

{¶66} Appellant submits that the evidence against him was disputable. He asserts that he walked into the carport after Levin tried to ignite the grill, he stood in front of the grill, and he turned the grill controls to the "off" position. He asserts that this constitutes

an arguable claim that he did not commit aggravated arson because it shows that he did not intend to knowingly cause a fire or explosion. He contends that his entire defense was based on showing that he did nothing to knowingly create a substantial risk of serious harm to any person. Appellant argues that the grill was more than "potentially useful" because testing it could have shown that his fingerprints or DNA were the last on the controls, which would have confirmed his claim that he tried to stop Levin from starting the fire as she turned the controls on.

{¶67} Appellant also maintains that testing the grill could have confirmed if it ignited due to a malfunction after Levin turned it on, pressed the buttons, and walked away, and it then ignited while he was in front of it. He notes Angela's testimony that the grill never malfunctioned when she used it. He claims that the video, in combination with testing the grill, could have shown that it did malfunction.

{¶68} Appellant directs the Court to the cross-examination of Captain Marcum, who revealed that he found the propane knobs in the "off" position. Appellant contends that preserving the grill for testing could have shown that he did not start the fire, especially with Captain Marcum's testimony that the grill's knobs were in the "off" position.

{¶69} Appellant also asserts that the State's main reasons for not seizing and preserving the grill were unknown at the time of the investigation. He notes that Captain Marcum testified that he failed to seize and preserve the grill because it was inconvenient to store, a video of the incident existed, and Levin had confessed. However, Appellant notes that Captain Marcum did not learn that a video of the fire existed or that Levin had confessed until after the grill was left at the scene and Angela discarded it days after the fire.

{¶70} Appellee counters that to determine whether the State's failure to preserve evidence violates due process depends upon whether the lost or destroyed evidence involves "materially exculpatory evidence" or "potentially useful evidence." Appellee notes that a defendant must prove that evidence is "materially exculpatory" by showing that it possesses an "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

**{¶71}** Appellee asserts that the grill was "potentially useful" and not "materially exculpatory" because the defense was not able to identify an evidentiary value in the grill, although an examination of the grill may have been helpful. Appellee argues that Appellant's argument is the same as that in *Youngblood* in that he asserts that the grill could have been subjected to tests that may have exonerated him.

**{¶72}** Appellee cites to the Ohio Supreme Court's decision in *State v. Powell*, 2012-Ohio-2577. There, Powell was charged with aggravated murder based on aggravated arson after he set fire to a two-story home which killed two of its residents. Fire investigators examined the home and the home was ordered torn down because it constituted a safety hazard. The defense filed a motion to dismiss the case because the State failed to preserve the home before they could inspect it.

**{¶73}** Appellee explains that the Ohio Supreme Court reviewed the ruling on the motion to dismiss and agreed that the home did not contain any "materially exculpatory" evidence before it was demolished. *Id.* at ¶ 79. Appellee cites the Court's holding that fire investigators had established where the fire originated, gasoline was used to start the fire, and arson was the cause of the fire. *Id.* at ¶ 78.

**{¶74}** Appellee contends that the same analysis applies here since the fire investigator determined the cause of the fire and where it started, video evidence supported those conclusions, and Levin admitted pouring gas into the grill and hearing the ignition button click three times while Appellant stood in front of it. Appellee concludes that the grill was therefore only "potentially useful" and Appellant was required to show bad faith in failing to preserve the grill.

**{¶75}** Appellee further asserts that Appellant failed to show that the State acted in bad faith because he cannot show that the fire investigator or the police detective acted in bad faith by failing to preserve the grill. Appellee cites Captain Marcum's testimony that he did not secure the grill because he felt it unnecessary for his investigation. Appellee also cites Detective Sergeant McGlynn's testimony that the grill was so insignificant to his investigation that it did not cross his mind to preserve it. (Motion Hg. Tr. at 27-28).

**{¶76}** In sum, Captain Marcum investigated the grill on the night of the fire, September 9, 2020. (Motion Hg. Tr. at 9-11). He testified that he cleared the scene on

that night, conducted an arson investigation, and turned the home back to Angela. (Motion Hg. Tr. at 11). She told him that she had watched the video from her carport camera which showed that the fire started in the grill. (Motion Hg. Tr. at 15).

{¶77} When asked if his investigation was complete at that time, Captain Marcum responded, "Mostly. We were waiting on video evidence." (Motion Hg. Tr. at 11). Captain Marcum testified that he could not determine the point of origin of the fire that night due to the gasoline. (Motion Hg. Tr. at 12). He explained that after watching the video from the camera in the carport five days later, he determined that the fire started at the grill. (Motion Hg. Tr. at 12). He reported that it was not necessary to return to secure the grill because he had the video. (Motion Hg. Tr. at 12). He determined that human interaction at the grill ignited the fire. (Motion Hg. Tr. at 12).

{¶78} On cross-examination, Captain Marcum testified that nothing about the grill was readily apparent to show that it had evidentiary value because of the video, Levin's confession, and Angela's statements. (Motion Hg. Tr. at 28).

{¶79} Detective Sergeant McGlynn testified that he did not know that a grill was involved in the fire until five days later when he watched the video. (Motion Hg. Tr. at 37-38). He stated that it was not necessary to preserve the grill at that time because he had the video and Levin's confession, but also because the grill was left with Angela for the five days. (Motion Hg. Tr. at 38). He agreed that the trigger for the fire in the grill was an ignition source. (Motion Hg. Tr. at 37).

{¶80} The trial court denied Appellant's motion to dismiss the case or to limit evidence relating to the grill at trial. The court set forth the distinction between "materially exculpatory" and "potentially useful" and the requirement that the former does not require the defendant to show bad faith on the part of the State while the latter does.

{¶81} The court indicated that it viewed the carport video in chambers and noted that technical difficulties prevented the playing of the video at the hearing. The court found that the video showed the two defendants near the grill. The court cited Captain Marcum's testimony that he did not destroy, dispose of, or assist in the disposal of the grill. The court cited Captain Marcum's further testimony that it was not a mistake to fail to preserve the grill because of the video of the incident and Ms. Levin's confession. The court also cited Detective Sergeant McGlynn's testimony reporting the same.

**{¶82}** The court concluded that from the video, it found nothing readily apparent about the grill, its condition or appearance that would make it "materially exculpatory." The court held that the grill could have been "potentially useful," and therefore, under *Youngblood*, a finding of bad faith on the part of the government must be established before sanctions could be considered. The court found that bad faith was not shown.

**{¶83}** The court further denied the motion in limine, holding that the video was unbiased and presented the finders of fact a rare opportunity to see the incident as it was occurring. The court reasoned that the jury could watch the video and decide for themselves what they saw, and Appellant could interpret for the jury his interpretation of what the jurors were watching.

**{¶84}** A de novo standard of review applies to a trial court's decision on a motion to dismiss criminal charges based upon the State's failure to preserve or disclose exculpatory evidence. *State v. Dotson*, 2018-Ohio-2481 (7th Dist.) citing *State v. Whalen*, 2008-Ohio-6739, ¶ 7-8 (9th Dist.). Thus, we accept the trial court's determination of the factual issues so long as they are supported by competent and credible evidence. *State v. Huffman*, 2024-Ohio-889, ¶ 20 (11th Dist.) (citations omitted). We then conduct a de novo review of the court's application of the law to those facts. *Id.*

**{¶85}** The Due Process Clause of the Fourteenth Amendment of the United States Constitution protects a criminal defendant from conviction where the State fails to preserve "materially exculpatory" evidence or destroys "potentially useful" evidence in bad faith. *Dotson*, 2018-Ohio-2481, ¶ 86, citing *State v. Tarleton*, 2003-Ohio-3492, ¶ 10 (7th Dist.) (citing *California v. Trombetta*, 467 U.S. 479, 489 (1984) and *Youngblood*, 488 U.S. at 55-58. The defendant must prove that the evidence at issue was "materially exculpatory." *State v. Jackson*, 57 Ohio St.3d 29, 33 (1991).

**{¶86}** Evidence is "materially exculpatory" if it (1) "possesses an exculpatory value that was apparent before the evidence was destroyed, and (2) is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means." *State v. Stubbs*, 2019-Ohio-4147, ¶ 21 (7th Dist.), citing *State v. Benton*, 136 Ohio App.3d 801, 805, (6th Dist. 2000) (citing *Trombetta*, 467 U.S. at 489).

**{¶87}** Evidence is "potentially useful" when "no more can be said then that it could have been subjected to tests, the results of which might have exonerated the defendant."

Case Nos. 23 MA 0090, 23 MA 0091

*Stubbs*, 2019-Ohio-4147 ¶ 22, quoting *Youngblood*, 488 U.S. at 57. If the evidence is "potentially useful" and not "materially exculpatory," a defendant must show that police or the prosecution acted in bad faith in failing to preserve evidence before the failure to preserve violates due process rights. *State v. Keith*, 79 Ohio St.3d 514, 523, (1997). Bad faith constitutes more than bad judgment or negligence. *Id.* "'It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.'" *State v. Wolf*, 2003-Ohio-4885, ¶ 14 (7th Dist.), quoting *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276 (1983).

{¶88} In *Stubbs*, 2019-Ohio-4147, Stubbs asserted on appeal that his due process rights were violated when the State failed to preserve "materially exculpatory" evidence of a gun after the State allowed test firing of the gun for operability after he filed a motion for the State to preserve the gun so that he could have it tested. We outlined the law on "materially exculpatory" evidence and "potentially useful" evidence and held that the gun was not "materially exculpatory." *Id.* at ¶ 23. We explained that:

> [t]he gun, on its face, did not possess an apparent exculpatory value. Nothing about it clearly exonerated appellant. Instead, the gun was potentially useful. It is possible that had the gun been subject to fingerprint or DNA testing, these tests could have revealed fingerprints or DNA belonging to other occupants of the car instead of appellant. Appellant could have used this evidence, if it existed, to bolster his defense that the gun did not belong to him. But testing also could have revealed appellant's fingerprints or DNA on the gun or the testing could have been inconclusive.

*Id.*

{¶89} We find that the grill was not "materially exculpatory." Appellant speculates that the grill may have malfunctioned in its operating system or ignition. He speculates that the results of an inspection of the grill and its controls could establish this malfunction. He hypothesizes that the grill controls or propane tank control could show his fingerprints were the last on the grill, which could show that he turned it to the "off" position or Levin's fingerprints on it to show that it was in the "on" position.

{¶90} However, Appellant fails to identify any materially exculpatory value to the grill beyond subjecting it to testing, with speculation that test results *may have* exonerated him. This is the same argument that the United States Supreme Court rejected as "materially exculpatory" in *Youngblood,* the Ohio Supreme Court denied as "materially exculpatory" in *Powell,* and this Court found as only "potentially useful*"* in *Stubbs.* Thus, we find that the trial court correctly applied the "potentially useful" standard.

{¶91} Addressing the failure to preserve the grill as a loss of "potentially useful" evidence, Appellant must establish bad faith on the part of the State or its agents in failing to preserve the grill. *Id.* While the better practice would have been to preserve the grill, it does not appear that Captain Marcum or Detective Sergeant McGlynn acted in bad faith by failing to preserve it. Detective Sergeant McGlynn certainly did not act in bad faith by failing to preserve the grill as he did not even know that the fire involved a grill until five days after the fire or that a video existed showing the fire. By the time he was notified, Angela had kept the grill in her carport in an unsecured area.

{¶92} Captain Marcum's testimony is slightly contradictory. He testified that, although he could not determine the origin of the fire on the night it occurred, he nonetheless failed to preserve the grill. (Motion Hg. Tr. at 11-12). At one point, he stated there was no need because he obtained new evidence via the video, however, he also testified that he did not learn of the video until five days later, after his investigation of the scene. (Motion Hg. Tr. at 12). Captain Marcum later testified that he spoke to Angela on the night of the fire. She told him she watched the camera footage and she saw that the fire started from the grill. (Motion Hg. Tr. at 14).

{¶93} While Captain Marcum failed to put forth the strongest reasoning for failing to preserve the scene, and particularly, the grill, Appellant cannot establish bad faith on the part of the State, the AFD, or the APD. At most, his testimony may show some negligence or bad judgment on the part of Captain Marcum. However, neither negligence nor bad judgment rise to the level of bad faith.

{¶94} Accordingly, we find that Appellant's first assignment of error lacks merit and is denied.

{¶95} In his second assignment of error, Appellant asserts:

Case Nos. 23 MA 0090, 23 MA 0091

**THE TRIAL COURT DENIED APPELLANT'S RIGHT OF CONFRONTATION UNDER THE FEDERAL CONSTITUTION AND HIS RIGHT TO MEET THE WITNESSES AGAINST HIM FACE-TO-FACE UNDER THE OHIO CONSTITUTION WHEN THE COURT LIMITED CROSS-EXAMINATION OF THE TESTIFYING CO-DEFENDANT WITHOUT JUSTIFICATION.**

**{¶96}** Defense counsel cross-examined Levin and began asking her, "[a]nd then isn't it accurate that the State of Ohio to ask you [sic] initially would you - - would you agree to cooperate, come and testify against Matt Alexander; and if you do so, instead of getting a potential of, you know, up to 11 years on the aggravated arson - - " (Trial Tr. at 401). The prosecution objected and the court asked defense counsel to refrain from questioning Levin about potential sentences and confine his cross-examination to the State's recommended sentence that she agreed to and the "many more years" that she could have received in prison if she did not plead guilty. (Trial Tr. at 402).

**{¶97}** The court thereafter heard argument in chambers and explained that it limited cross-examination on the exact penalties Levin faced because the jury would be indirectly exposed to Appellant's potential sentence. (Trial Tr. at 403). Defense counsel reminded the court of its pretrial promise to give latitude in raising biases that Levin may have. (Trial Tr. at 405). He requested that the court allow him to ask Levin if she was facing "many more" years in prison had she not taken a plea bargain. (Trial Tr. at 407). The court indicated that defense counsel and the State agreed to the suggestion that defense counsel ask Levin, "isn't it true you accepted a plea where you would be recommended to serve two or three years, instead of maybe facing many more years were you not to accept that plea?" (Trial Tr. at 404).

**{¶98}** Appellant contends that the trial court denied him the constitutional right of confrontation by improperly limiting his counsel's cross-examination of Levin. He contends that the court would not allow his counsel to ask Levin the exact number of years she was facing in prison had she not entered into a plea agreement which included cooperation against him. Appellant asserts that earlier in the trial, the court informed counsel it would allow wide latitude on the cross-examination of Levin on her biases in testifying against Appellant.

{¶99} Appellant acknowledges that courts may place limitations on cross-examination in criminal cases, but notes that it is only for compelling reasons and the limitations are narrow. He contends that the trial court not only curtailed his counsel's cross-examination, but also crafted the questions that counsel could use in the cross-examination.

{¶100} Appellant also questions the court's reasoning for limiting counsel's cross-examination that Levin was facing a potential sentence of "many more years," rather than the exact sentence she was facing had she not pled guilty. The court explained that it did so because it did not want the jury to know the potential penalties Appellant faced, which would be the same as Levin. Appellant notes that the record fails to show the jury was aware or would have known that he was charged with the same offenses as Levin or that they potentially faced the same sentence. He also submits that jurors are instructed to follow the law and the court instructed the jurors not to consider possible sentences in deliberating. Appellant also contends that even if the jury did know the potential sentence, the State bears that risk when electing to use a co-defendant at trial.

{¶101} Appellee responds that although the federal and state constitutions grant defendants the right of confrontation, the trial court possesses sound discretion in limiting that right and may limit the extent of cross-examination into appropriate subjects of inquiry. Appellee asserts that the court exercised sound discretion as it faced challenges regardless of the determination it made on the issue. Appellee maintains that on one hand, the jury would learn Appellant's maximum potential sentence if the court allowed defense counsel to ask Levin the sentence she faced if she did not plead guilty. Yet on the other hand, if the court denied defense counsel the right to ask Levin about her plea deal to demonstrate a reason for her to be untruthful at trial, this would violate his right to confront the witnesses against him and his counsel would be prevented from cross-examining her effectively as to her motives to testify.

{¶102} Appellee cites cases where the Ohio appellate courts found no abuse of discretion when the trial courts limited defense counsels' cross-examinations. *State v. Gonzales*, 2002-Ohio-4937, ¶ 46-47 (1st Dist.) (while cross-examination can serve to demonstrate the co-defendant's motive to lie, defense counsel is not permitted to explore the issue "to the extent counsel desired to 'hammer it home' to the jury.") Appellee notes

that the jury in this case heard that Levin faced the same charges as Appellant, her charges were reduced due to the plea agreement, and she was facing "many more years" in prison if she did not enter a plea agreement and testify against Appellant.

**{¶103}** The standard of appellate review of a trial court's determination on the scope of cross-examination is abuse of discretion. *State v. Lundgren*, 73 Ohio St.3d 474 (1995). Accordingly, the court's ruling on these matters will not be reversed absent a showing that the trial court's attitude was arbitrary, unreasonable, or unconscionable. "As long as the defense has the opportunity to question testifying co-defendants regarding the full benefits of their plea agreements and demonstrate the bias or prejudice of the co-defendants, the trial court does not err by limiting cross-examination on speculative issues." *State v. Montgomery*, 2023-Ohio-4472, ¶ 29 (3rd Dist.), citing *Lundgren*, 73 Ohio St.3d 474 (1995).

**{¶104}** We find that the trial court did not abuse its discretion here. The court explained that the language of "many more years" was sufficient because it established that Levin received a deal for her testimony against Appellant, which may show her bias to lie. (Trial Tr. at 406). The court also emphasized that defense counsel raised Levin's other biases, such as when counsel contrasted Levin's statement to Detective Sergeant McGlynn that it was her fault that the fire started with her testimony that Appellant did it. (Trial Tr. at 397). Defense counsel also contrasted Levin's statement to McGlynn that she did not want to go to jail with her testimony that Appellant started the fire. (Trial Tr. at 399). He raised Levin's statement to Appellant that the man who went to Angela's house with them was Levin's boyfriend with her later statement that she did not know him. (Trial Tr. at 400). Defense counsel also distinguished Levin's statement to McGlynn that she was not intoxicated on the night of the fire with her testimony that she was not in her right mind that night due to intoxication. (Trial Tr. at 401-402). Defense counsel further asked Levin about her statement to McGlynn that she and Appellant were trying to buy marijuana and they were not trying to buy cocaine. (Trial Tr. at 403).

**{¶105}** Further, defense counsel asked the court if he could use the words "many more" when describing the number of years Levin faced if she had not taken the plea bargain and went to trial. (Trial Tr. at 407). The court agreed and defense counsel said,

"Okay." (Trial Tr. at 407). He used this language in cross-examining Levin at trial. (Trial Tr. at 409).

{¶106} From the record, we hold that the trial court did not abuse its discretion in limiting defense counsel's cross-examination on the specific potential sentence Levin faced. The jury was presented with possible reasons for Levin's motivation to lie as the jury was made aware of Levin's charges, the sentence that the State was recommending based upon her agreement to cooperate, and the fact that she faced a sentence that was many more years if she had not pled. The jury received the information that it needed without information as to the sentence that Appellant was facing. The jury received the information that Levin faced a much shorter sentence because she chose to plead guilty and testify against Appellant.

{¶107} Accordingly, Appellant's second assignment of error lacks merit and is overruled.

{¶108} In his third assignment of error, Appellant asserts:

**THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING APPELLANT TO A SENTENCE 5 TIMES LONGER THAN THE CO-DEFENDANT.**

{¶109} Appellant asserts that he received a sentence five times longer than that of Levin. Appellant urges that Levin took the first action by attempting to ignite the grill. He explains that the trial court's decision is rooted in the fact that Levin entered a guilty plea whereas he exercised his right to a trial. He does not claim entitlement to the same sentence as Levin, but he asserts that his sentence reflects more than that he started the fire that she tried to start but could not. Appellant appears to understand the difficulties in advancing this argument given recent case law. However, he believes the sentencing scheme in Ohio has completely stripped appellate courts of the ability to review a trial court's sentence.

{¶110} "[A]n appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 2016-Ohio-1002, ¶ 1. A sentence is clearly and convincingly

contrary to law if it falls outside of the statutory range for the particular degree of offense; if the trial court failed to properly consider the purposes and principles of felony sentencing as enumerated in R.C. 2929.11 and the seriousness and recidivism factors set forth in R.C. 2929.12; or if the trial court orders consecutive sentences and does not make the necessary consecutive sentence findings. *State v. Pendland*, 2021-Ohio-1313, ¶ 41 (7th Dist.), citing *State v. Collins*, 2017-Ohio-1264, ¶ 9 (7th Dist.); *State v. Bonnell*, 2014-Ohio-3177, ¶ 30.

{¶111} Appellant here challenges the proportionality of his sentence as compared to Levin and he challenges the sentencing scheme in Ohio. This Court has recently addressed both of these issues.

{¶112} Beginning with proportionality, this Court has held that "[a] defendant alleging disproportionality in felony sentencing has the burden of producing evidence to 'indicate that his sentence is directly disproportionate to sentence given to other offenders with similar records who have committed these offenses.'" *State v. Williams*, 2015-Ohio-4100, ¶ 52 (7th Dist.), citing *State v. Wilson*, 2013-Ohio-3915, ¶ 16 (8th Dist.). Thus, not only must a defendant demonstrate a disproportionate sentence, but he must also provide evidence of a similarly situated codefendant, including consideration of all prior criminal records.

{¶113} At the sentencing hearing, defense counsel acknowledged that Appellant could not receive the same two-year sentence as Levin, who pled to different charges, but sought a similar sentence to the extent allowed by law. The court expressed its understanding regarding Levin's sentence, but explained that it could not treat both offenders the same as Levin walked to the grill and unsuccessfully attempted to ignite, while Appellant thereafter walked to the grill and it ignited, placing the lives of several people in danger. (Sent. Tr. at 7-28). Thus, the court identified Levin's action as an attempted but unsuccessful crime and Appellant's action as a completed successful crime.

{¶114} Further, while Levin had not even been sentenced at the time of Appellant's sentencing hearing, the trial court acknowledged that she was likely to receive two years of incarceration. The court noted that while the offenses were part of the same general crime, both parties played vastly different roles. While Levin admittedly attempted

to ignite the grill, it was Appellant who took the final step and actually did ignite the grill, before calmly walking away in the burst of flames.

**{¶115}** Thus, not only did Appellant fail to establish that the same offenses were committed, he also failed to present any evidence of Levin's record as required pursuant to Ohio law.

**{¶116}** Regarding Appellant's challenge to Ohio's sentencing scheme, this Court rejected a similar argument. Recently, this Court held:

> While Ohio's sentencing laws strongly limit appellate review, a sentence must fall within the statutory range and a court must demonstrate that it considered the applicable sentencing laws which are designed to take aggravating and mitigating facts into consideration, among other things. While the constitutionality of Ohio's statutes does not appear to have been directly challenged, the Ohio Supreme Court has repeatedly addressed the standard of review and upheld the sentencing structure.

*State v. Chappell*, 2024-Ohio-1541, ¶ 39 (7th Dist.).

**{¶117}** Accordingly, we find that Appellant's third assignment of error lacks merit and is overruled.

**{¶118}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

Dickey, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**